CHARLES WEITZ' SONS, Appellee and Appellant, v. UNITED
STATES FIDELITY & GUARANTY COMPANY, Appellee and
Appellant, et al., Appellee.

MAY 8, 1928.

REHEARING DENIED OCTOBER 26, 1928.

*Parrish, Cohen, Guthrie, Watters & Halloran* and *O. M. Brockett*, for Charles Weitz' Sons, appellant.

*Stewart & Hextell* and *Miller, Kelly, Shuttleworth & McManus*, for United States Fidelity & Guaranty Company, appellant.

*Havner, Flick & Powers*, for Pyramid Portland Cement Company of Iowa, appellee.

FAVILLE, J.—Charles Weitz' Sons is a copartnership engaged in the business of contracting and building. The Pyramid Portland Cement Company is a corporation engaged in the manufacture of Portland cement. The United States Fidelity & Guaranty Company is a surety company. On February 1, 1923, Weitz' Sons and the Pyramid Portland Cement Company entered into a written agreement, by which Weitz' Sons undertook to build certain storage bins for said cement company. The contract was in the form of a letter written by Weitz' Sons to the Pyramid Portland Cement Company, which was accepted by it in writing. The letter contains the following:

"It is our understanding that you desire that we construct the storage bins in accordance with drawings submitted, and accept extended payments in lieu of cash, such payments to be made by the delivery of Portland cement to us at a future date.

"We have not the available funds with which to carry on the work, and we do not care to ask for financial assistance from our bank for the reason that we will require a large amount of

credit later on when road work begins. We offer, however, this proposal, but we are not urging approval.

"Assuming that the contract represents a sum of approximately $60,000, of this sum you should arrange with the Iowa Trust and Savings Bank for a full line of credit to us and which we understand is $20,000, as to the additional credit we will seek other sources. The arrangement with the bank or banks should be, that the money be loaned to us at intervals of the first and fifteenth of the month during the progress of the work, and in accordance with invoices for the material and labor in place or in storage during the construction period; our notes to mature in four months, with interest as may be elected by the banks and with renewal privileges for the unpaid portion of the obligation and until the obligation of delivering cement to us is performed. It is assumed that within four months you will manufacture cement, and it shall be understood that option be given us to issue orders for cement deliveries at any time following the date of manufacture, and which you guarantee will be within thirty days after the storage bins are completed. Our orders for cement will be uniformily distributed during a period of two years following thirty days after completion of the storage bins. Payments for cement to be made direct to you and all checks to be indorsed by you to the order of the Iowa Trust and Savings Bank or other banks as may be directed, the bank to make credit notation on our note or notes, and acknowledge receipt of same to us. * * * We would require that you furnish bond guaranteeing either the delivery of cement as agreed upon, or, in case you should be unable to make delivery that you will make cash payment equal to the value of the cement ordered.

"It is also understood that the price of cement on orders given to you by us in payment of this operation will be ten cents less per barrel than the dealers base price for Des Moines, or for shipments within the state at the time of shipment, the terms of payment to be as usual on all cement contracts."

Pursuant to this contract, the surety company executed the bond in suit, in the penal sum of $60,000, conditioned upon performance of the contract by the Cement Company. After the storage bins were constructed, the Cement Company furnished certain cement to Weitz' Sons under the contract, and later defaulted; and this action is to recover upon the bond for the

balance due upon the contract. Without specifying the allegations of the answer and amendments thereto, in a general way the defenses of the Surety Company are that the contract between Weitz' Sons and the Cement Company was altered, without the knowledge or consent of the Surety Company; that orders for deliveries were not made by Weitz' Sons in accordance with the contract; that there were false representations made by Weitz' Sons inducing the execution of the contract, in respect to the cost of the construction of the storage bins; and that a larger credit should be given the Cement Company for payments claimed to have been made.

Certain matters are conceded, or fully established by the evidence. It is undisputed that the total cost of the construction of the storage bins was $89,850.38. It also appears that the Cement Company furnished to Weitz' Sons 4,210 barrels of cement, under the contract, and are entitled to credit for $9,986.86 therefor. Work was commenced under the contract on February 25, 1923, and the job was completed September 1, 1923. The Cement Company filled certain orders given it for cement by Weitz' Sons under the contract until in April, 1924. In February, 1924, the Cement Company advised Weitz' Sons that it could not fill certain of the orders for cement that had been given under the contract. The Surety Company was also advised of this default on the part of the Cement Company. In March, 1924, Weitz' Sons gave the Cement Company a general order to deliver 600 barrels of cement per week until December 1, 1924. The Cement Company advised Weitz' Sons that it could not comply with this order, and the Surety Company was notified of this default. On or about May 1, 1924, a contract was entered into between the Century Lumber Company and the Pyramid Portland Cement Company with regard to the sale of cement to the Century Lumber Company. This contract is known in the record as Exhibit HH, and a material part thereof is as follows:

"The party of the first part agrees to sell and deliver to the party of the second part such cement as may be ordered by it, at the current dealers' market price prevailing at the time same is ordered, with the customary discount plus an additional discount of ten cents (10c) per barrel, party of the second part to make payment therefor, as follows;

"One and 60/100 ($1.60) per barrel, plus forty cents (40c) per barrel for sacks, to be paid party of the first part within ten (10) days from the date of invoice; the balance of the purchase price, after deducting the freight, is to be paid by party of the second part to Chas. Weitz' Sons to apply on the indebtedness owing by party of the first part to Chas. Weitz' Sons.

"The party of the first part will reimburse the party of the second part for all sacks returned, at the rate of ten cents (10c) per sack, either by paying therefor in cash, or, at the option of second party, by crediting the amount thereof on cement subsequently ordered."

Under this contract, the Cement Company furnished 38,268 barrels of cement to the Century Lumber Company between May 26, 1924, and August 28, 1925. Of this amount Weitz' Sons obtained from the Century Lumber Company, and used, 33,605 barrels, and Weitz' Sons credited the Cement Company upon its indebtedness under the original contract with the sum of $15,933.08.

I. We first consider the contract Exhibit HH and its effect upon the rights of the parties. The partnership Charles Weitz' Sons is composed of Charles W. Weitz, Fred W. Weitz, and Edward Weitz. The Century Lumber Company is a corporation having a capital stock of $150,000. Three shares of the stock of said corporation, of the par value of $100 each, are owned by two sons of the said Charles W. Weitz. The remainder of the stock of said corporation, being of a par value of $149,700, or 99.8 per cent of the entire capital, is owned by the three partners who compose the firm of Charles Weitz' Sons. These three partners are also the directors of the Century Lumber Company. The copartnership and the Century Lumber Company have offices in the same building. The question at this point is whether or not there is such identity of parties as that the contract Exhibit HH between the Century Lumber Company and the Cement Company should be held to be in fact a contract between Charles Weitz' Sons and the Cement Company; and if so, whether or not it amounted to an alteration of the original contract between Weitz' Sons and the Cement Company. The Surety Company invokes the rule that equity looks to the substance, rather than the form, and will disregard the latter in

arriving at the ultimate truth, in order to effectuate justice. The plenary power of a court of equity in this regard is well established, and is most frequently invoked where a question of fraud is involved. In this case there is no claim of fraud or bad faith, except as it may possibly be inferred from the record. It does not appear that the fact that the contract Exhibit HH was executed, was made known to the Surety Company prior to the commencement of this action. It may be conceded, for the purpose of consideration of the questions involved at this point, that, if the contract Exhibit HH was in fact a contract between Weitz' Sons and the Cement Company, it did constitute a material alteration of the original contract between said parties, and having been executed without the knowledge or consent of the Surety Company, would release the latter on its bond. *Independent Dist. v. Reichard,* 50 Iowa 98; *Stillman v. Wickham,* 106 Iowa 597; *Holland v. Story County,* 195 Iowa 489; *Lamson v. Maryland Cas. Co.,* 196 Iowa 1185. In order to apply the rule, it is essential that it be established that Weitz' Sons and the Century Lumber Company, at least for the purposes of the contracts in question, were one and the same entity. In other words, in order to constitute a material alteration of the original contract, it must appear that the contract Exhibit HH between the Century Lumber Company and the Cement Company was, in effect, a contract between Weitz' Sons and the Cement Company. In *Des Moines Gas Co. v. West,* 50 Iowa 16, we considered a question involving a corporation, and held that the legal rules which regard a corporation as an artificial person and limit the interest of the stockholder in the property of the corporation to his shares in the corporation will not stand in the way of a court of equity when it is attempted to use the same as an instrument of fraud. We have no question of fraud in the instant case, and the cited authority is not in point. Reliance is placed upon the case of *Keokuk Elec. R. & P. Co. v. Weisman,* 146 Iowa 679. Under the peculiar facts of that case, it was held that the conveyance by a corporation of all of its stock, which was all held by the defendant, carried with it the right to the use and servitude then existing over certain property owned by the individual defendant. The case is correct, under its peculiar facts, and it is not inconsistent with our holding in the instant case. As is pointed out in *Fleming v. Casady,* 202

Iowa 1094, 1106, in the *Keokuk Elec. R. & P. Co.* case and other similar cases the identity of the individual as the sole owner of the corporation and its property was established; and upon the basis of estoppel, or to prevent a fraud, equity recognized the corporate entity as being identical with the individual stockholders, and the legal fiction of a separate corporate organization was disregarded. But in this case, as in *Fleming v. Casady,* supra, the separate corporate organization is not shown to have been a fiction, but it was established that it was a separate and distinct entity, carrying on a business separate and distinct and of a different character from that carried on by the partnership Weitz' Sons. It not only was not a fiction, but was a distinct, separate, and different legal entity, and there was no complete identity, either of ownership or of interest. Presumptively, the corporation was a distinct legal entity, and under the record in this case, it was clearly established to be such. Without further discussion at this point, we hold that the record does not disclose, nor is a court of equity bound to find, nor could it well do so, that the partnership Chas. Weitz' Sons and the corporation the Century Lumber Company were identical. It therefore follows that the execution of the contract Exhibit HH between the corporation Century Lumber Company and the Cement Company did not constitute an alteration or modification of the original contract between Weitz' Sons and the Cement Company.

II. Holding, as we do, that the contract Exhibit HH was not a part of the original contract between Weitz' Sons and the Cement Company, it necessarily follows that the Surety Company's contention that there has been no default on the part of the Cement Company under the provisions of the contract Exhibit HH is without merit. The deliveries made under the contract Exhibit HH were not made under the original contract between Weitz' Sons and the Cement Company, and although the contract Exhibit HH has been fully performed between the parties thereto, such performance is not available to the Surety Company as a respondent on the bond of the Cement Company to Weitz' Sons under the original contract between said parties.

III. The Surety Company further contends that it is exonerated because of the claim that Weitz' Sons violated the terms of the original contract with the Cement Company by reason of the character of the orders given by Weitz' Sons. The

original contract between Weitz' Sons and the Cement Company provided that:

"Our orders for cement will be uniformly distributed during a period of two years following thirty days after the completion of the storage bins."

The contention of the Surety Company is that, by ascertaining the average credit which should be given for cement furnished, and taking into consideration the total amount due under the contract, it would have required a delivery of approximately 44,600 barrels of cement to liquidate the total indebtedness, and the Surety Company's contention is that this quantity of cement "uniformly distributed" over a period of two years would have required the delivery of approximately 429 barrels of cement per week. We must consider the contract in the light of the circumstances surrounding the parties, and give it a reasonable construction. The orders as given by Weitz' Sons were not unreasonable, nor can it be fairly contended that they were not in substantial compliance with the contract and with the plain purpose and intent of the parties. It certainly was not contemplated that the cement should be ordered by Weitz' Sons with mathematical exactness as to the number of barrels ordered, either per month or per week or otherwise. It does not appear that the default of the Cement Company was due to the fact that the orders of Weitz' Sons were not uniform, nor is it claimed that such default was due to excessive and unreasonable orders on the part of Weitz' Sons. We think the record fails to sustain the Surety Company's contention at this point, and that there was no such substantial variation from the terms and provisions of the contract and the clear intention and contemplation of the parties as excused the Cement Company from defaulting on its contract, or as released the Surety Company from liability on the bond.

IV. The Surety Company contends that it is released from liability on its bond because of a claim of false and fraudulent representation on the part of Weitz' Sons in the procurement of the original contract with the Cement Company. The contention of the Surety Company at this point is that Weitz' Sons, in submitting their proposition to the Surety Company, estimated

the construction of the storage bins at approximately $60,000, and that, as finally constructed, the storage bins cost in excess of $89,000. It is apparent from the record that the amount of $60,000 was a mere estimate. There was no contract or agreement on the part of Weitz' Sons to erect the storage bins for any fixed and definite sum. There was no protest on the part of the Cement Company with regard to the cost of said construction, nor is objection now made by the Cement Company that the said cost was excessive, unreasonable, or improper. The parties could readily have entered into a contract for a specific and definite amount to be paid for the construction of the storage bins in question. They did not do so, but agreed that the work should be undertaken and completed, and the amount of $60,000 was a mere estimate of the probable cost of construction. There is no evidence of any fraud or false representation on the part of Weitz' Sons in making said proposition. The rules with regard to fraud and false representation are well established, but under the record in the instant case they have no application here. There was no fraud, false representation, or mutual mistake shown, such as to render the contract voidable or to relieve the Surety Company from its liability under the bond.

V. The Surety Company contends that it is entitled to have the full amount received by Weitz' Sons credited upon the amount of the penal liability under the bond. The entire amount due under the contract is $89,000. The amount of the Surety Company's liability under its bond is $60,000. The total payments received by Weitz' Sons from the Cement Company leave the amount due under the contract in excess of the amount of the penalty fixed in the bond, to wit, $60,000. There is no contention that the amount received has not been properly applied upon the contract. The Surety Company is liable to the extent of the penalty of the bond for the net balance due. The court did not err in holding it so liable, and the credits received by Weitz' Sons were properly applied.

VI. The Surety Company pleaded a counterclaim, which, in a general way, grew out of the following facts: Weitz' Sons obtained a contract from the United States government for the construction of the cantonment at Camp Dodge, and erected said cantonment and received a fee from the government there-

for. Weitz's Sons engaged one Mardis, together with other parties, to assist in the supervision and management of the work of constructing said cantonment. No definite contract was entered into between said parties with regard to compensation. After the work was completed, and the compensation, at least in part, ascertained, a conference was held between Weitz' Sons and three parties who had constituted a so-called "advisory board" in the construction of said cantonment. This is referred to in the record as the agreement of December 20, 1917. It is contended that at said time Weitz' Sons, acting through one of the copartners, agreed with the members of the advisory board to pay each of them the sum of $25,000 as additional compensation to the amount previously paid them, which was $1,000 a month for a period of five months, during which time said cantonment was in process of erection. At a later date, an action was instituted by one Tusant and others, claiming that the contract under which the cantonment was constructed, while being in the name of Weitz' Sons, was in fact a joint adventure between a number of contractors and builders in the city of Des Moines, and it was sought to recover a portion of the fee obtained by Weitz' Sons from the government. This action came to this court. *Tusant & Son Co. v. Weitz Sons*, 195 Iowa 1386. Much of the testimony of the witness Weitz in that case was introduced into the record in the instant case. We have examined the record with care. It is unnecessary that we quote it herein, and we shall not attempt to state anything further than our conclusions therefrom. We find from the record that there was a promise on the part of Weitz' Sons to pay to Mardis the sum of $25,000 in addition to the amount paid him per month, and that this was for services rendered by Mardis to Weitz' Sons, and that there was consideration to support the promise. The claim of Mardis for said compensation to the amount of $16,200 was duly assigned to the Surety Company on the 13th of August, 1917. This furnishes the basis of the Surety Company's counterclaim. We find that Weitz' Sons were advised of this assignment, and that they recognized the Mardis claim as being a valid claim "for services."

Weitz' Sons plead that this claim is barred by the statute of limitations. The Surety Company plead that Weitz' Sons are estopped to plead the statute of limitations. While the evi-

dence is in direct conflict, we are persuaded to the conclusion that there was an understanding and agreement between the attorney representing the Surety Company and Weitz' Sons that the Mardis claim in the hands of the Surety Company should await the outcome of the final determination of the *Tusant* case, and that, if Weitz' Sons were successful in the Tusant litigation, said firm would pay the Mardis claim to the amount of $16,200. As a part of this agreement, the attorney for the Surety Company was to assist in the defense of the *Tusant* case at the expense of the Surety Company. This was done. Under the record, the evidence is sufficient to sustain the conclusion that Weitz' Sons are estopped to now contend that the counterclaim is barred by the statute of limitations.

VII. It is contended that the Surety Company cannot maintain its counterclaim on the assignment of the Mardis claim without bringing into the case other parties who might be interested in said claim. The assignment was in writing, and purported to assign and transfer all the money due or to become due to Mardis under his contract with Weitz' Sons. It is now contended that the assignment was only a partial assignment, because it was given to secure $16,200, which was less than the full amount of the Mardis claim.

The question of the necessity of other parties, now urged in argument, does not appear to have been presented to the trial court, by motion, pleading, or in any manner. Without determining the merits of the contention, it is sufficient to say that it cannot be urged for the first time on appeal.

The arguments have taken a very wide range; but, in view of our conclusion as above stated, we do not deem it necessary to extend this opinion by a review of other matters than those referred to herein, although all contentions of the respective parties have been fully considered. We reach the conclusion that Weitz' Sons were entitled to recover on the surety bond the amount due thereon, with interest, and that the Surety Company was entitled to have its counterclaim established. The

judgment of the trial court effectuates this result. It is correct, and it is—*Affirmed*.

STEVENS, C. J., and EVANS, KINDIG, and WAGNER, JJ., concur.