WESCOTT & WINKS HATCHERIES, appellant, v. F. M. STAMPER COMPANY, appellee.

No. 49197

(Reported in 85 N.W.2d 603)

D. C. Nolan and William M. Tucker, both of Iowa City, for appellant.

Messer, Hamilton & Cahill, of Iowa City, for appellee.

SMITH, J.—Plaintiff pleaded a breach of a contract by which defendant agreed to sell and deliver 6000 turkey poults to it at Sumner, Iowa, on or about July 17, 1953; and asks judgment for $9000. Verdict for defendant was directed and plaintiff appeals from the resulting judgment.

As written evidence of the claimed contract sufficient to satisfy the statute of frauds, plaintiff pleaded three documents and offered them in evidence as Exhibits A, C and B (numbered 1, 2 and 3 respectively, in petition). Defendant denied the sufficiency of the offered evidence, and by pleading and throughout the trial, by appropriate motions and objections, urged the statute of frauds. No technical contention is urged that the statutory defense was not properly raised.

Leo P. Winks testified the business of plaintiff-corporation of Sumner is "merely a hatchery, plus this growing of turkeys * * *. It is what we call the grass-roots branch of the original business" of a former corporation of the same name. He is the vice-president, and said that plaintiff was "not hatching any turkeys in 1953", nor had it been "for many years"; but it raised turkeys—"We get different batches of turkey poults * * * so they will be staggered along."

He said: Along about May 20, 1953, "we broadcast what we call a card, soliciting tenders on 6000 Beltsville white turkey poults for delivery—we wanted them on or about the 17th of July, 1953." The cards were sent to suppliers of turkey poults "including F. M. Stamper Company at Iowa City. I had heard that (it) had succeeded the Priebe Company in Iowa City * * *."

On *May 25* Charles Jirsa, a salesman of defendant-company, an old acquaintance of Mr. Winks, and a former employee of the Priebe Company, called Mr. Winks "and said they could take care of the order."

The stock of defendant-company was entirely owned by a Missouri corporation of the same or a similar name that had a hatchery at Centralia, Missouri, though its principal office was in Moberly, Missouri. As a result of that telephone conversation, Jirsa, in Iowa City, prepared Exhibit A on a printed "Order Blank F. M. Stamper Co. Hatchery Centralia, Missouri", dated "5-26-53", and unsigned. He mailed the original to the Hatchery at Centralia, Missouri, and carbon copy (the one in evidence) to Mr. Winks at Sumner, Iowa.

Mr. Jirsa was not an agent of and in no way represented the parent Missouri corporation. He said "My duties with the F. M. Stamper Co. of Iowa * * * were—I sold feed, turkey feed, chicken feed and hog feed. I also bought chickens and things." The two F. M. Stamper concerns however had the same persons as president and directors and the defendant used certain printed forms of the Missouri corporation at times. Jirsa was not an employee of defendant at time of trial when he testified.

Exhibit A, as filled in by Mr. Jirsa, recites: "Sold to Wescott & Winks, Sumner, Iowa; ship to same; date wanted week of July 17; 6000 Beltsville Whites, 50¢ per poult, amount $3000, due when delivered." The printed "terms" (evidently somewhat modified by the writing) recites: "15% down books your order. Balance to be paid 10 days before shipping. *All orders, deliveries and agreements are contingent upon wars, strikes, fire, accidents or other causes beyond our control.*" (Emphasis supplied.)

On May 27, 1953, Mr. Winks on behalf of plaintiff wrote Exhibit C to defendant at Iowa City ("cc - Centralia, Mo."). It acknowledges receipt of Exhibit A—"yesterday's acknowledgment covering 6000 Belt poults * * * for delivery 'week of July 17'" and adds "we wanted them *delivered on July 17th,* and presumed that had been understood. Unless it can be handled in that manner, will you kindly contact us?"

The letter then explains why the date is important, assumes the poults "are pullorum clean", and concludes with a hope they

"will measure up to the standard of product sought." No answer ever came from Jirsa or defendant-corporation.

About a week thereafter Exhibit B was written, dated June 4, 1953, at Centralia, Missouri, "cc Chas. Jirsa, Iowa City." It was signed "F. M. Stamper Co. Hatchery by B. J. Legan Mgr.":

"Wescott & Winks, Sumner, Iowa, Dear Sirs:

"Our suppliers of Beltsville eggs have informed us that they will be unable to supply the eggs for your Poult order. We have phoned breeders from coast to coast trying to locate some eggs, but cannot get them. That is the quality which we must have. I am sorry that we will be unable to fill your order, but wish to thank you for your consideration and hope that we may be of service to you in the future."

We have fairly summarized the record except perhaps some pertinent matters we may notice as we proceed. Fundamentally but two legal questions are involved. If defendant's contention be upheld as to either, the case must be affirmed: 1. Was there any note or memorandum of the contract "signed by the party to be charged" sufficient to comply with the statute of frauds, Code section 554.4? 2. Regardless of the statute, does the offered evidence show a contract—an actual meeting of minds—upon which to predicate a judgment for damages for its breach?

I. Code section 554.4 came into our Code as part of the "Sales Act" adopted in 1919, now appearing in the chapter on Sales Law, in Title XXIV on "Personal Property." See Thomas v. Peoples Gas & Electric Co., 220 Iowa 850, 852, 263 N.W. 499.

Section 554.4(1) provides: "A contract to sell or a sale * * * shall not be enforceable by action * * * unless some note or memorandum in writing of the contract or sale be signed by the party to be charged or his agent in that behalf." (We omit quoting exceptions created by partial delivery or partial payment.)

(Code section 622.32, the analogous general statute of frauds, does not apply to sales but decisions under it are sometimes useful in construing the later sales statute.)

We have recently (1952) said the statute is a rule of evidence. See Carmichael v. Stone, 243 Iowa 904, 54 N.W.2d 454.

We may concede, as argued by plaintiff, the memorandum need not be in form of a contract and that several writings, taken together, may constitute the memorandum. But we cannot ignore the specific language which requires the writing to be signed "by the party to be charged or his agent in that behalf." No citation of authority is necessary here, but see Morris Furn. Co. v. Braverman, 210 Iowa 946, 949, 230 N.W. 356; 37 C. J. S., Frauds, Statute of, section 178a, b. No part of the goods was accepted, nothing was given "in earnest to bind the contract."

It is clear there is here no signature by defendant or its "agent in that behalf." Mr. Jirsa, with whom alone plaintiff dealt, signed no note or memorandum of any kind. There was no signature by Reid Fitzpatrick, defendant's manager since it started doing business, buying out and succeeding Priebe & Sons, Mr. Jirsa's former employer, in 1952.

■ II. Plaintiff is driven to a contention that the defendant-corporation and Missouri corporation are legally one entity and that Exhibits A, B and C taken together (Exhibit B, signed by "F. M. Stamper Co. Hatchery at Centralia, Missouri") constitute the required memorandum in writing "signed by the party to be charged."

This argument necessarily assumes Exhibit B is the required memorandum in writing "signed by the party to be charged or his agent in that behalf." That supplies the only signature among the exhibits, other than plaintiff's own signature to Exhibit C. The argument assumes "F. M. Stamper Co. Hatchery" at Centralia, Missouri (or B. J. Legan Mgr., who signed Exhibit B) was the party or agent of the party to be charged. And these assumptions are based on the testimony that the Missouri corporation owned all the stock of defendant and was in a position to control its operations. There is no evidence that Mr. Legan who signed Exhibit B had any relationship to defendant unless through being manager of the Missouri company's *hatchery*. We cannot predicate any such relationship of agency as to him or as to the Missouri parent corporation upon the ownership of the one corporation's stock by the other.

Nor can we disregard the separation of identity between the two corporations. Plaintiff's theory regarding it is ingenious but unsound—as ingenious theories sometimes are. Plaintiff

first cites "13 Am. Jur. 162." But the subject is more fully discussed in other places throughout the Am. Jur. article. The statements and citations are too extensive and numerous to permit more than a résumé by us.

We find no discussion in the text or in any of the cited cases involving the theory urged here that a memorandum by a parent company or agent of a parent company may constitute compliance with the statute of frauds sufficient to render a subsidiary corporation liable on its own otherwise oral contract. The discussion in the texts and cases we have studied involves question of the claimed liability of the parent for acts or commitments of the subsidiary corporation.

In such cases we conclude the correct rule to be that the separate corporate existence of the subsidiary may be ignored (at least by equity) in order to circumvent fraud, restraint of trade, creation of monopolistic combination or other violation of law by the parent company or by an individual in control of both corporations.

In short the separation of corporate entity will be disregarded only where used as a cloak for fraud or illegality; and it is still true the organization of a corporation for the purpose of avoiding personal liability for its commitments does not in itself constitute fraud, justifying disregard of the corporate entity. As said in 13 Am. Jur., Corporations, section 1382, "A holding corporation has a separate corporate existence * * * unless circumstances show * * * [it] is a mere sham or has been used as an instrument of fraud." "The corporation will be regarded as a legal entity, as a general rule, and the courts will ignore the fiction of corporate entity only with caution, and when the circumstances justify it, and when it is used as a subterfuge to defeat public convenience, justify wrong, or perpetrate a fraud." Commerce Trust Co. v. Woodbury, 8 Cir., 77 F.2d 478, 487.

Examination of the corresponding article in Corpus Juris Secundum leads us to the same conclusion. In 18 C. J. S., Corporations, section 581, it is succinctly stated:

"In conformity with this principle [immunity of sole stockholder] it is held that a corporation merely owning all, or

practically all, of the stock of another corporation is not liable for the acts or obligations of the latter corporation, in the absence of any statutory provision on the subject.

"However, this immunity was created for certain legitimate purposes and it should not be permitted for purposes that are not legitimate."

In 18 C. J. S., Corporations, sections 4 to 7, the theory is discussed and stated that this general rule will be disregarded when it is demonstrated "the corporate cloak is utilized as a subterfuge to defeat public convenience, to justify wrong, or to perpetrate fraud." Section 6, page 378. None of those conditions is shown here.

Plaintiff cites Flinn v. Western Mutual Life Assn., 187 Iowa 507, 510 et seq., 171 N.W. 711, 713, which held that two associations incorporated, one in California, the other in South Dakota, represented "one and the same entity" where the record showed a long history of operation and representation to that effect. The action was against the California company on a policy issued by the Masonic Aid Association organized under South Dakota law in 1886. The decision in effect holds the defendant represented a reorganization of the earlier association. The appeal involved a question of proper service and a factual determination of jurisdiction. It is not contrary to our conclusion here.

The opinion says at page 512 of 187 Iowa: "We are content to follow the lead of the secretary of both associations, and to say that the two associations represent one and the same entity."

We had occasion to consider a contention somewhat analogous to plaintiff's claim here and said the "plenary power of a court of equity" (to hold an identity of parties between a corporation and its sole or minority stockholders) "is most frequently invoked where a question of fraud is involved." Charles Weitz' Sons v. United States Fidelity & Guaranty Co., 206 Iowa 1025, 1029, 1030, 219 N.W. 411, 413.

An examination of the Fletcher Cyclopedia reveals that author has reached the conclusion we have expressed in this division: "That one * * * corporation may own * * * all of the stock of a corporation does not establish a legal identity * * *

so as to make acts by one the acts of the other." 1 Fletcher Cyclopedia, section 28, page 104. See also section 25, page 90 et seq.

 We cannot disregard the separation of identity between the two corporations here merely because one is parent and sole stockholder of the other. That separation has always been considered an important attribute of the corporate relationship. Disregard of it is properly an equitable prerogative to circumvent its improper use.

III. Having held for defendant on the statute of frauds issue any expression as to the insufficiency of the entire testimony to show a real meeting of the minds is probably technical dictum.

It may be proper however to point out the weakness (perhaps absence) of any showing that a technical sale or contract of sale was actually entered into even if the written evidence be considered. Winks testified: "He (Jirsa) said they had the poults and would make delivery on or about the date wanted. I told him to confirm it and he said he would and did."

The only confirmation Jirsa vouchsafed him was a carbon copy (Exhibit A) of the unsigned "order blank" sent to the Hatchery from which the poults were apparently to be received. It was a "confirmation" in a very limited sense. Winks, speaking for plaintiff, immediately expressed disapproval (Exhibit C) of what the order blank said as to when the poults were wanted. There was no other communication, written or oral, between the parties. Plaintiff however within a week learned the order could not be filled. He did not learn it from defendant but from the source defendant's salesman expected to get the poults.

Defendant did not, under the record, have a hatchery. It commenced business in 1952 "processing poultry, buying poultry and eggs and turkeys. * * * they buy the poultry on the foot and kill and clean it for packing. * * * We sold quite a bit alive too, sent some alive different places."

Mr. Winks, under the record, must have understood he was not dealing with a concern which had the ordered goods in stock, but that the order was conditioned upon defendant's ability to procure them from another source. He placed an order,

paid no part of the price. When he asked "confirmation", according to his own testimony he was "particularly anxious about the price of 50¢. * * * I never questioned about the delivery * * *."

Even if there were no question of the statute of frauds we would be at least reluctant to hold there was a firm contract sufficient as a foundation for a claim in damages.

But we need not answer that question. We have no doubt there was no written memorandum signed either by defendant or by any agent of defendant. The judgment for defendant is affirmed.—Affirmed.

HAYS, C. J., and BLISS, WENNERSTRUM, GARFIELD, THOMPSON, LARSON, and PETERSON, JJ., concur.

OLIVER, J., dissents as to Division II.