William E. MURRAY and S.C.S. Enterprises, Inc., Appellants,

v.

Jerry CONRAD, a/k/a Gerald Conrad, d/b/a Conrad Distributing, Defendants.

S.C.S. ENTERPRISES, INC., Appellant,

v.

PEOPLES BANK AND TRUST COMPANY, Appellee.

PEOPLES BANK AND TRUST COMPANY, WATERLOO, Iowa, Appellee,

v.

The NATIONAL BANK OF WATERLOO, Intervenor-Appellee,

v.

Gerald L. CONRAD and Barbara K. Conrad, Conrad Distributing, Inc., S.C.S. Enterprises, Inc., d/b/a Sterling Distributing Co., and William E. Murray, Defendants.

G. HEILEMAN BREWING COMPANY, INC., A Corporation, Appellee,

v.

S.C.S. ENTERPRISES, INC., A Corporation, d/b/a Sterling Dist. Co., and Peoples Bank and Trust Company, Waterloo, Iowa, A Corporation, Defendants.

No. 83–123.

Supreme Court of Iowa.

March 14, 1984.

Rehearing Denied April 6, 1984.

C.A. Frerichs, Waterloo, for appellants.

Charles F. Hinton, Waterloo, for appellee Peoples Bank and Trust Co.

Considered by REYNOLDSON, C.J., and UHLENHOPP, McCORMICK, McGIVERIN and SCHULTZ, JJ.

McCORMICK, Justice.

This appeal stems from a judgment entered in one of several lawsuits that resulted from the collapse of the financial empire of Gerald L. Conrad. Plaintiff Peoples Bank and Trust Company was awarded judgment on a theory of conversion against defendants William E. Murray and S.C.S. Enterprises, Inc., d/b/a Sterling Distributing Co., in a dispute over the right to a beer inventory. The questions are whether the inventory was covered by the bank's security agreement with Conrad and, if so,

whether the amount of the judgment is correct. Because we give an affirmative answer to these questions, we affirm the judgment.

█ The conversion action was tried at law to the court. The court's findings of fact thus have the force of a jury verdict, and we view the evidence in its light most favorable to those findings. If they are supported by substantial evidence, we are bound by them. The findings are broadly and liberally interpreted and in the case of ambiguity are construed to uphold rather than defeat the judgment. *See Farmers Insurance Group v. Merryweather*, 214 N.W.2d 184, 186 (Iowa 1974). We will evaluate the trial court's findings with these principles in mind.

Conrad was an entrepreneur with various business ventures in central Iowa. Among his enterprises were beer distributorships in Ames and Marshalltown operated through a solely owned corporation called Conrad Distributing, Inc., (C.D.I.). The corporation used the name Conrad Distributing. In 1976 Conrad contacted William E. Murray, president and managing officer of a beer distributorship in Waterloo called S.C.S. Enterprises, Inc. (S.C.S.), operating as Sterling Distributing Company. S.C.S. had the local Miller Brewing Company (Miller) franchise, and Conrad wanted to acquire it. Murray was interested in selling his business to Conrad, so Conrad began negotiating with People's Bank and Trust Company (Peoples) for financing and with Miller to obtain transfer of the franchise. S.C.S. and C.D.I. were the only entities of the parties licensed in Iowa to buy and sell beer.

On March 22, 1977, Miller indicated it would approve the transfer, and Peoples agreed to finance Conrad's purchase. Conrad purchased the S.C.S. beer inventory on that date with a check for $36,851.31 drawn on C.D.I.'s account with Peoples. On March 23, 1977, Murray furnished a letter to Peoples, as a condition of the bank's financing of the purchase of S.C.S. assets by Conrad, stating:

In consideration of your extending financing to Gerry Conrad for the purchase of the Miller Brewing franchise, all Beer distributing rights, all assets, and accounts receivable in the Waterloo and surrounding area, I hereby consent that any security interest perfected by you in the granting of such financing shall be of a higher priority and take precedence over any security interest perfected by me in the same collateral.

I hereby represent that I am the controlling stockholder and sole managing officer of S.C.S., Inc. The consent as to priorities above given extends to the interests of this corporation as well.

On the next day, Peoples deposited $100,-000 in the C.D.I. account, part of which covered the check for the beer inventory. A security agreement was executed clearly describing the collateral including the inventory. The agreement and accompanying promissory note to Peoples carried the signatures of Gerald L. Conrad, Barbara K. Conrad and "Gerald L. Conrad d/b/a Conrad Distributing" by Gerald L. Conrad.

Conrad then commenced operating his beer distributorship in the Waterloo area out of a Waterloo warehouse owned by Murray individually. Pending transfer of the Miller franchise, S.C.S. purchased the beer for Conrad from Miller. S.C.S. also purchased at least some beer for Conrad from other breweries. Checks to reimburse S.C.S. for the beer were written on the C.D.I. account. Conrad and his employees controlled and distributed the beer. Checks were written on the C.D.I. account for other purposes, including transfers of funds to other Conrad enterprises. Some of the checks were characterized as "loans" to those enterprises and some were not. Deposits were made in the C.D.I. account from some other Conrad accounts, individual and corporate. Conrad had at least ten accounts in various banks in several Iowa cities in his own name or in the name of one of his corporations. Funds were deposited in and transferred from these accounts as if the accounts all belonged to Conrad individually.

On May 17, 1977, Conrad and Murray entered an agreement for Conrad's purchase of Murray's S.C.S. stock. At that time Murray was the sole stockholder of S.C.S. Although Conrad did not make the necessary downpayment, Murray permitted him on that date to take over the S.C.S. bank account and ordering of beer. From May 17 until June 8, 1977, Conrad had exclusive control of the beer operation. On June 6 Miller informed Murray it would not issue a franchise to Conrad. Murray then initiated a lawsuit and obtained an injunction on June 8 against Conrad's exercise of control of S.C.S. assets, allegedly including the beer inventory in the Waterloo warehouse.

Peoples also claimed the beer inventory pursuant to its security agreement. None of the $100,000 loan by Peoples had been paid. Murray and Peoples agreed that S.C.S. should sell the beer and that the proceeds should be held in escrow. This arrangement lasted until June 22 when Murray and S.C.S. terminated the agreement, sold the remainder of the beer, and retained the proceeds.

The beer inventory on June 8, 1977, was worth $70,427.44. After trial, the trial court found that Conrad owned or had rights in the inventory individually and that it was thus subject to Peoples' security agreement. The court also said Murray and S.C.S. were not in any position "to go behind" the security agreement in view of their involvement in the relevant events. The court ultimately awarded Peoples judgment against S.C.S. and Murray for $55,326.16 with interest from June 22, 1977, subject to credit for $26,527.47 held in escrow. The judgment was for the inventory value on June 8 less $15,101.28 owed by S.C.S. as of the time of trial to The National Bank of Waterloo on a security agreement acknowledged by Peoples to be senior to its own. National Bank was an intervenor in Peoples' conversion action.

■ I. *S.C.S. ownership of the beer inventory.* Murray and S.C.S. contend that S.C.S. owned all or at least part of the beer inventory in the Waterloo warehouse on June 8, 1977. This contention is based on the fact that S.C.S. held the franchises under which the beer was purchased, the beer was initially purchased from the breweries by S.C.S., and the breweries had not been paid for a substantial part of the beer in the warehouse on that date. We find that the evidence did not compel the trial court to find S.C.S. owned any of the beer. The most cogent evidence against S.C.S. ownership is in an affidavit executed by Murray with his attorney's assistance in July 1977.

■ Murray first described his oral agreement to sell S.C.S. to Conrad by selling him its stock. He said: "Sometime during 1977, Conrad and I agreed on the terms of such sale. Such terms of sale are reflected in a stock sale agreement attached hereto. Additional terms called for the purchase of the inventory at its laid in inventory price." Murray also said:

On March 22, 1977, without a written agreement, Conrad under the trade name of Conrad Distributing Company began to sell beer out of my warehouse at 549 Center St., Waterloo, Iowa. This was occasioned by his oral commitment to enter a sales agreement of the stock. At this time Conrad Distributing Company purchased the then existing inventory of S.C.S. Enterprises, Inc. This was [consummated] by a check from Jerry Conrad to S.C.S. Enterprises, Inc. From and after that date of March 22, 1977, Conrad Distributing Company began the wholesale distribution of beer from the Center Street Warehouse.

... It did so by selling the beer inventory that it originally purchased from S.C.S. Enterprises and replacing and adding to that inventory by beer purchased from the various breweries that S.C.S. Enterprises had a franchise with. Said additional purchases were made by Conrad ordering in the name of S.C.S. Enterprises on certain orders of beer and paying for them with a Conrad Distributing Co. check. This method was followed in all cases except with the Miller Brewing Company. With the Miller Brewing

Company, Conrad would order the amount of beer, place money in S.C.S. Enterprises checking account and out of this checking account, a check would be paid for the beer.

At trial Murray testified he had not been careful in this affidavit to distinguish Conrad individually from C.D.I., but he did not impeach his description in the affidavit of the nature of the operation between March 22 and June 8, 1977.

Under Iowa Code section 554.2401(2) (1975), title to the beer passed to the "buyer" at the time and place the "seller" delivered it. In this case S.C.S. was an intermediary in purchasing the beer from the breweries. S.C.S. immediately resold the beer to Conrad or C.D.I., depending on the capacity in which Conrad was acting. The beer was delivered F.O.B. to the warehouse and Conrad took possession of it at that time. He, or C.D.I., thus took title to the beer as buyer upon its delivery to the warehouse. *See Swets Motor Sales, Inc. v. Pruisner*, 236 N.W.2d 299, 304–05 (Iowa 1975); *Herington Livestock Auction Co. v. Verschoor*, 179 N.W.2d 491, 494–95 (Iowa 1970).

The trial court therefore was not required to find S.C.S. owned any of the beer inventory in the warehouse on June 8, 1977. We have no occasion to decide what rights S.C.S. may have had at that time against Conrad or C.D.I. with respect to the beer.

II. *Peoples' security interest in the beer.* Murray and S.C.S. contend alternatively that if S.C.S. did not own the beer it could only have been owned by C.D.I. They point out that C.D.I. was a licensed distributor and Conrad individually was not. Because C.D.I. was not signatory to the security agreement covering the beer, Murray and S.C.S. argue that Peoples could not establish any rights in the beer.

Among other findings, the trial court said that under the confused circumstances including "the interchange of entities and entity accounts," Gerald L. and Barbara K. Conrad did give Peoples a valid security interest in the beer. The court found that Gerald had rights in or owned the beer within the meaning of Iowa Code section 554.92031(c) and that Murray and S.C.S. had recognized his rights when they furnished Peoples the subordination letter of March 23, 1977. Murray and S.C.S. contend the court's findings are not supported by substantial evidence or applicable law.

In relevant part, section 554.9203 provides that a security interest attaches and is enforceable if "the debtor has signed a security agreement which contains a description of the collateral," "value has been given," and "the debtor has rights in the collateral." The first and third requisites are at issue here. Murray and S.C.S. identify the Conrads individually as the debtors and C.D.I. as the holder of any rights in the collateral. They say no basis in the evidence or law exists for saying C.D.I. is the debtor in the security agreement or that the Conrads individually had any rights in the collateral. Substantial evidence and support in the law does exist, however, for each of these alternative findings.

First, the law permits a finding that when Gerald L. Conrad signed the security agreement for Conrad Distributing he was signing for C.D.I. in his capacity as sole owner and controlling officer of the corporation. The formal requisites of a security agreement are "in the nature of a Statute of Frauds." U.C.C. § 9–203 comment 5 (1978). Courts thus distinguish between the function of financing statements and security agreements:

Section 9–402 requires that the financing statement include the name, as well as the signature of the debtor. The inclusion of the debtor's name on the financing statement generally prevents misfiling and establishes who the debtor is. The security agreement signature requirement, on the other hand, is primarily a statute of frauds. *Thus, when an authorized principal of the company has executed a security agreement, the absence of the true business name should not defeat the security interest.* Of course, the business representative's signature will not always operate to bind

his principal. Such issues will turn an agency, corporation, and partnership law applicable to secured transactions through 1–103.

(Emphasis added). J. White and R. Summers, *Handbook of the Law Under the Uniform Commercial Code* 913 (2d ed. 1980). Notice and filing are not issues here.

■ Substantial evidence in the present case supports a finding that Gerald L. Conrad was acting for C.D.I. in executing the security agreement for Conrad Distributing even though the corporation was not properly identified in the instrument. The loan proceeds went into the corporate account. Those funds were to be used for purchase of the beer inventory and ultimately other S.C.S. assets. Peoples carried the account in the name of "Conrad Distributing Co., Inc., d/b/a Conrad Distributing." The deposit slip for the loan proceeds designated the account as "Conrad Distributing." The security agreement specifically described the beer inventory and other collateral. A reasonable inference exists that Peoples and Conrad would not have simultaneously described the beer inventory to be acquired by C.D.I. through a loan to C.D.I. as collateral to be provided only by Conrad individually. This inference is buttressed by the facts that C.D.I. operated as Conrad Distributing, the loan proceeds were deposited in the account called Conrad Distributing, and Conrad purported to execute the security agreement for Conrad Distributing. The factfinder could reasonably conclude that Conrad signed the security agreement with the intent to bind C.D.I. and grant a security interest in the beer inventory acquired by C.D.I. and that he had actual authority to do so. Other courts have reached similar conclusions in analogous facts. *See In re Great Basin Transport, Inc.*, 32 B.R. 365, 367–68 (Bkrtcy.W.D.Okl.1983); *In re Mid-Atlantic Piping Products of Charlotte, Inc.*, 24 B.R. 314, 318–21 (Bkrtcy.W.D.N.C. 1982); *In re A & J Kwik-N-Handi, Inc.*, 12 U.C.C.Rep.Serv. (Callaghan) 765, 767–68 (M.D.Ga.1973).

■ Secondly, the law alternatively permits a finding that Conrad individually had rights in the beer inventory when he signed the security agreement. This court has recognized that a corporate entity should be disregarded in exceptional circumstances, "for example, where the corporation is a mere shell, serving no legitimate business purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." *Newberry v. Barth, Inc.*, 252 N.W.2d 711, 714 (Iowa 1977). Factors to be considered include "whether (1) the corporation is undercapitalized, (2) the corporation lacks separate books, (3) its finances are not kept separate from individual finances, or individual obligations are paid by the corporation, (4) the corporation is used to promote fraud or illegality, (5) corporate formalities are not followed, or (6) the corporation is a mere sham." *Briggs Transportation Co. v. Starr Sales Co.*, 262 N.W.2d 805, 810 (Iowa 1978). Many of those factors are present here.

This situation differs from piercing the corporate veil to reach shareholders or officers. Here the corporate form should be disregarded to reach corporate assets as if they were the assets of the controlling individual. This is analogous to cases in the parent-subsidiary context where the subsidiary's separate corporate identity is disregarded to prevent the parent from perpetrating fraud or injustice. *See Inn Operators, Inc. v. River Hills Motor Inn Co.*, 261 Iowa 72, 84–85, 152 N.W.2d 808, 815–16 (1967); *Wescott & Winks Hatcheries v. F.M. Stamper Co.*, 249 Iowa 30, 35–36, 85 N.W.2d 603, 606–07 (1957). We believe the same principle applies when an individual is in the position of the parent corporation.

The factfinder could find C.D.I. was a mere shell established by Conrad to hold his distributorship license. The corporation was not capitalized, and no stock was ever issued. No corporate books were kept. Corporate funds were commingled with funds of Conrad individually and with funds of other Conrad corporations.

A witness for Murray and S.C.S. testified about tracing funds run through the C.D.I. account. He said:

For money that was going out of Peoples Bank, it was being deposited in the Commercial State Bank in Marshalltown, which means just electronically over a telephone line, really, into the account at the Nevada National Bank under the name of Conrad Distributing, which is account 304568, and once it was there it would be fragmented into the Midwest Properties account or the Gerald Conrad account or even some combination of accounts. And so then you had to get those accounts and spread them out and trace it down like that. So ultimately you could figure out of an initial amount transferred where it finally rested in terms of going off to something that was not a Conrad related entity.

He also testified:

But if you could get your hands on every piece of paper, I mean every bank record, every item for all of these accounts, and if you could somehow reconstruct what all of his sales were on all of his entities and all of the rental income and so on and so forth, and if you could amass that in one room and sit down with a half a dozen accountants and enough money to pay for it, you might be able to figure out what was going on, and you would have to make some assumptions and use some fifo theories and stuff and might be able to analyze it, but it would be awfully hard.

Conrad employed one man who was responsible to check all of the individual and corporate accounts at the beginning of each day. That employee testified his responsibility was to make deposits and transfer funds from one account to another as needed to pay overdrafts or checks presented for payment without regard to the origin of the funds or the character of the account. A substantial part of the Peoples loan to C.D.I. was disbursed in this manner. Beer sales receipts deposited in the C.D.I. account were similarly disbursed.

Conrad did not treat C.D.I. for financial purposes as an entity separate from himself. Through the subordination letter of March 23, 1977, Murray and S.C.S. demonstrated they understood Peoples was to have a security agreement in the beer inventory. As Murray's July 1977 affidavit shows, they too identified C.D.I. with Conrad. In these circumstances it would be unjust for the corporate form to be used to defeat the rights of Peoples on the ground the bank was only a creditor of Conrad individually. Here the policies favoring incorporation are clearly outweighed by the policies favoring compensation of creditors. *See Minton v. Cavaney,* 56 Cal.2d 576, 579, 15 Cal.Rptr. 641, 643, 364 P.2d 473, 475 (1961).

■ Therefore, upon either alternative basis for binding C.D.I. to the security agreement, we uphold the trial court's finding that the agreement covered the beer inventory. The trial court did not err in enforcing the security agreement against the competing claim of Murray and S.C.S.

III. *The amount of the judgment.* Murray and S.C.S. contend the amount deducted from Peoples' damages because of the senior lien of National Bank should have been the amount secured on the date of the alleged conversion rather than the amount secured at the time of trial. Payments by S.C.S. in the intervening period reduced its debt to National Bank from $26,069.25 to $15,101.28. We pass the question whether Murray and S.C.S. preserved error on this contention.

■ The general rule is that the measure of damages for conversion is the fair and reasonable market value of the property at the time of the taking. *Ontario Livestock Commission Co. v. Flynn,* 256 Iowa 116, 126, 126 N.W.2d 362, 368 (1964). In this case that value was $70,-427.44. The obligation of S.C.S. to National Bank was independent to the issue of the relative priority of the bank security agreements in the beer inventory. Payment by S.C.S. to National Bank reduced its obligation to National Bank but did not entitle S.C.S. to have its obligation to Peoples for conversion of the beer inventory reduced by a corresponding amount. When Murray and S.C.S. converted the beer inventory, they did not acquire a concomitant right to have the damages to Peoples lowered by amounts paid by S.C.S. on its separate obli-

gation to National Bank. *See Camp v. Ortega,* 209 Cal.App.2d 275, 286–89, 25 Cal. Rptr. 873, 879–81 (1962). Peoples agreed to the reduction that was made in its judgment and does not now question it.

Murray and S.C.S. also assert that the judgment should have been reduced by the portion of the beer inventory allegedly acquired by Conrad from S.C.S. by fraud, theft or conversion. Again we pass the question whether error was preserved on this issue. Nor do we suggest we agree that Conrad was guilty of the wrongdoing alleged. His misconduct would not affect Peoples' security interest in the inventory. *See Swets Motor Sales, Inc.,* 236 N.W.2d at 305.

We have considered all of the contentions and arguments of Murray and S.C.S., whether specifically addressed or not, and we find them without merit.

AFFIRMED.