**In re Glen L. WATERS, Lori F. Waters, George A. Waters, Teresa A. Waters, Lyle O. Waters, Lisa A. Baum–Waters, Waters Brothers Partnership, Debtors.**

**Bankruptcy Nos. 87–00406C, 87–00404C, 87–00405C and 87–00407C.**

United States Bankruptcy Court, N.D. Iowa.

Sept. 12, 1988.

---

Julie Trachta and Thomas G. McCuskey, Cedar Rapids, Iowa, for debtors.

William S. Vernon, Eric Lam, Cedar Rapids, Iowa, for PCA.

Kristin Davis, Asst. U.S. Atty., Cedar Rapids, Iowa, for CCC.

Peter C. Riley, Cedar Rapids, Iowa, Special Counsel.

AMENDED MEMORANDUM Re: Determination of Secured Status

## MICHAEL J. MELLOY, Chief Judge.

This Court previously entered an Order, which included Findings of Fact, and Conclusions of Law in connection with the determination of secured status of Production Credit Association of the Midlands (PCA) in property of an alleged partnership, namely Waters Brothers Partnership. Timely motions were filed to Amend the Findings of Facts and Motions to Alter or Amend Judgment. An Order was subsequently entered making certain modifications to this Court's original Order on the determination of secured status.

This opinion incorporates into one order the original Findings of Fact, Conclusions of Law and Order entered by this Court on February 8, 1988, as well as the amendments and modifications thereto made by this Court's Order of May 31, 1988.

The matter before the Court is the determination of secured status of Production Credit Association of the Midlands (PCA) in property of an alleged partnership, namely, Waters Brothers Partnership (Partnership). A hearing was held by this Court on April 22, 1987, on the issues of use of cash collateral and validity of liens held by PCA. An Order was issued allowing the Debtors limited use of the cash on hand and granting PCA a post-petition security interest in the event it was determined that any of the cash used was cash collateral of PCA.

Subsequently, PCA objected to a claim filed by Commodity Credit Corporation (CCC) in the bankruptcy cases of the individual Waters brothers as well as the Waters Brothers Partnership alleging that CCC is an unsecured creditor. The determination of the secured status of CCC involves the same evidence and testimony necessary to determine the secured status of PCA. The Debtors, PCA and CCC, all agreed that this Court should determine the ownership of the various farm assets as between the individual Debtors and the Waters Brothers Partnership as well as the issue of the extent of any liens of PCA and CCC in those assets. To the extent any party may argue that this matter should be

determined in the context of an adversary proceeding pursuant to Rule 7001, et seq., the parties have waived any procedural defect and have consented to a determination of these issues in the context of a cash collateral motion and objection to CCC's claim. Having reviewed the evidence and briefs of counsel, the Court makes the following Findings, Conclusions, and Order pursuant to Fed.R.Bankr.P. 7052. This is a core proceeding under 28 U.S.C. 157(b)(2)(K).

## FINDINGS OF FACT

The cash collateral dispute between the Debtors and PCA involves the Debtors desire to use the proceeds from the sale of crops and livestock, as well as cash generated from government program payments, including deficiency payments. PCA claims it has a perfected security interest in all of the Debtors' personal property, including cattle, crops, and government payments; the Debtors claim that PCA has no security interest in any of that property. The dispute with CCC involves the Debtors' 1985 corn crop which is currently under "seal" with CCC.

George, Glen, and Lyle Waters are brothers and have been in business together since 1976. Glen Waters and Lyle Waters graduated from college in 1976. George Waters attended Kirkwood Community College for several years, but did not graduate. Glen Waters worked for PCA as a loan officer from February, 1985, until October, 1986. One of his duties was completion of loan documents for PCA borrowers.

The three brothers claim that they have operated their business as a partnership since 1976. However, a written partnership agreement was not executed by the brothers until the spring of 1985. This document was never recorded and apparently was executed for the sole purpose of acquiring a FmHA loan guaranty. The partnership agreement executed in 1985 designates the name of the partnership as "Waters Brothers".

A borrower-lender relationship was established between the alleged partnership

and PCA in 1980. PCA was the primary operational lender until 1986, at which time the parties were unable to reach an agreement for financing the 1986 crop year. A lawsuit was commenced against PCA in the Iowa District Court in and for Cedar County in the fall of 1986; the named plaintiffs in that lawsuit were the three individual brothers and their wives as well as Waters Brothers Partnership. On November 13, 1986, counterclaims were filed by PCA in conjunction with its answer and affirmative defenses, seeking foreclosure on mortgages executed by Glen, Lyle and George Waters on property pledged as security by the individuals and requesting appointment of a receiver. Separate Chapter 11 bankruptcy petitions were filed on February 19, 1987, by Glen & Lori Waters, George & Teresa Waters, Lyle Waters & Lisa Baum–Waters, and the alleged partnership, Waters Brothers Partnership, thus staying the state court proceedings.

At the time of the filing of their Chapter 11 petitions, the total debt owed by all debtors to PCA was in the amount of $585,-965.71. Evidence presented to the Court concerning this outstanding debt includes:

1) Loan applications completed and signed by Glen Waters, Lyle Waters, and George Waters on March 14, 1983, November 17, 1983, December 27, 1984, and April 29, 1986. All of these applications list the borrower as "Waters Brothers", and two of them specifically designate the applicant as a partnership.

2) Various security agreements entered into by the parties. Date and debtor listed in each of those security agreements are as follows: .

(a) A security agreement dated November 11, 1980, listing the name of debtor(s) as "George Waters and Teresa Waters, Lyle Waters and Lisa Baum–Waters, Glen Waters and Lori Waters."

(b) A security agreement dated December 8, 1981, listing the debtor(s) as "George Waters and Teresa Waters, Lyle Waters and Lisa–Baum Waters, Glen Waters and Lori Waters."

(c) A security agreement dated March 14, 1983, listing the name of debtor(s) as "Waters Brothers." This security agreement was signed by the three brothers and their wives.

(d) A security agreement dated January 19, 1984, listing the name of debtor(s) as "Waters Brothers." This security agreement was also signed by the three brothers and their wives.

(e) A security agreement dated December 27, 1984, listing the debtor(s) as "George, Lyle O. and Glen L. Waters." This security agreement was signed by the three individual brothers and their wives.

(f) A contract compensation assignment between "Waters Brothers", referred to as grower, and Production Credit Association of the Midlands as lender. This agreement is signed "Waters Brothers George Waters." The assignment gives to PCA all interests the grower may have in compensation received from the performance of a contract in which the grower was to provide seed corn to Northern American Seeds.

(3) A UCC–1 financing statement filed with the Iowa Secretary of State by PCA on November 14, 1980. The name of the debtor(s) is listed as follows:

Waters, George & Teresa
Waters, Lyle & Lisa Baum
Waters, Glen & Lori

An amendment signed by George Waters, Teresa Waters, Glen Waters, Lori Waters, Lyle Waters and Lisa Baum–Waters and the PCA's representative was filed on January 16, 1985. A continuation was filed on September 27, 1985.

4) A copy of the security agreement dated January 19, 1984, listing the debtors as "Waters Brothers", filed with the Secretary of State on August 29, 1986, in lieu of a standard UCC–1 financing statement. Paragraph one which is headed "PARTIES—PROPERTY" provides that the debtor grants to PCA:

"... a security interest pursuant to the Uniform Commercial Code of Iowa, in and to the following described prop-

erty of Debtor, hereinafter referred to as 'collateral', all similar collateral hereafter acquired by Debtor and all proceeds of collateral now owned or hereafter acquired:

Two hundred sixty (260) head of cattle described as follows:

122 Bred Cows, Aug. Wt. 1000#

13 Bred Heifers, Aug. Wt. 900#

5 Bulls, Aug. Wt. 1500#

120 Calves, Aug Wt. 550#

Feed and Grain as follows:

12,440 Bu. Seed corn

10,064 Bu. PIK corn

18,000 Bu. Corn

1,700 Bu. Oats

Silage

Hay ,

Straw

Machinery and equipment: See Attachment—Exhibit No. 1 for specific description thereof

*Collateral that is:* (A) machinery or equipment includes … (B) livestock includes … (C) *crops* include annual and perennial crops *growing or to be grown, whether harvested or unharvested,* regardless of where stored; all products, purchases and exchanges thereof; all seed, fertilizers, herbicides, insecticides, chemicals and supplies used in connection therewith; all warehouse receipts, letters of entitlement issued by the Commodity Credit Corporation, or other documents issued for grain stored or to be stored, including all Debtor's right, title and interest in said receipts, letters and documents; *and all government subsidy payments of whatever kind or form, including but not limited to Payment-in-kind,* storage, *deficiency,* and interest. (emphasis added)

In addition to the foregoing Debtor grants a security interest to Secured Party in and to all the Debtor's documents, general intangibles, and accounts arising from the sale, lease or other disposition of collateral (but Debtor may sell, lease or otherwise dispose of collateral only to the extent stated in paragraph 12 of this Agreement), and all the Debtor's right, title, and interest therein.

The real estate description contained in Paragraph 2 for purposes of crop collateral is:

30 Acres SW¼ of the SE¼ of Sec. 30, T–79–N R–4–W; 109 acres S½ of the NW¼ and the SW¼ of the NE¼ of Sec. 8 T–80–N R–4–W; 156.2 acres NW¼ of the NE¼ of Sec. 15 T–80–N R–4–W. W½ of the SE¼ and the SW¼ of the NE¼ of Sec. 15 T–80–N R–4–W; 38 acres NW¼ of the SW¼ of Sec. 5 T–80–N R–4–W; 350 acres N½ of the Sec. 20 T–79–N R–4–W; 70 acres NW¼ of the NW¼ of Sec. 22 T–79–N R–4–W; 100 acres SE¼ of the SE¼ of Sec. 17 T–79–N R–4–W; 220 acres in the E½ Sec. 33 T–79–N R–4–W all in Cedar County, Iowa.

5) Real estate mortgages executed by George, Lyle, and and Glen Waters on March 14, 1983, and on December 27, 1984. Both real estate mortgages contain "rents and profits" clauses.

The individual Waters brothers and/or the partnership are also indebted to the CCC. The CCC filed identical proofs of claims in all four bankruptcy cases which are involved here. The only loans which remain unpaid at this time are a bin loan and two 1985 crop year farm stored Corn Price Support and Grain Reserve corn loans. The loan for the grain storage bin does not appear to be a subject of this dispute, so the only loans in question are the two 1985 crop year farm stored corn Price Support and Grain Reserve loans.

Prior to 1984, transactions between the Debtors and CCC were conducted primarily in the name of Waters Brothers. CCC was aware as early as 1978 that the three brothers operated the farming business as Waters Brothers, and prior to 1984, CCC treated Waters Brothers as a partnership. Betty Morris, an administrative clerk of CCC, testified that in 1984 CCC was directed to obtain documentation of partnership, corporations, trusts, etc. and to check with the Secretary of State for filings by the various entities. CCC was unable to find a filing of a Waters Brothers Partnership agreement with the Secretary of State of Iowa. It was thereby determined by CCC

that the brothers should sign up for the farm programs as individuals.

The pertinent evidence presented to the Court concerning CCC's security interest in the Debtors' 1985 corn crop is as follows:

1. Farm Storage Note and Security Agreement signed on December 3, 1985, by Glen Waters, Lori Waters, George Waters, Teresa Waters, Lyle Waters, and Lisa Baum–Waters. The name of the producer is listed as Glen Waters, Lyle Waters, and George Waters.

2. Warehouse Storage Note and Security Agreement signed on December 13, 1985, by Glen Waters, Lori Waters, George Waters, Teresa Waters, Lyle Waters, and Lisa Baum–Waters. The name of the producer is listed as Glen, Lyle, and George Waters.

3. Farm Storage Note and Security Agreement signed on December 16, 1985, by Glen Waters, Lori Waters, George Waters, Teresa Waters, Lyle Waters, and Lisa Baum–Waters. The name of the producer is listed as Glen, Lyle, George Waters.

4. Farm Storage Note and Security Agreement signed on June 2, 1986, by Glen Waters, Lori Waters, Lyle Waters, George Waters, Teresa Waters, and Lisa Baum–Waters. The name of the producer is listed as Waters Brothers.

5. Farm Storage Note and Security Agreement signed on May 21, 1986, by Lori Waters, Glen Waters, Lyle Waters, Lisa Baum–Waters, Teresa Waters, and George Waters. The name of the producer is listed as Glen, Lyle, George Waters.

6. Three financing statements filed with the Secretary of State of Iowa on September 6, 1985. The financing statements are identical with the exception that one is signed by Glen and Lori Waters, the second by George and Teresa Waters and the third by Lyle and Lisa Baum–Waters. It covers 1985 corn and 1985 soybeans. A real estate description is provided in lack of the financing statement.

The alleged partnership has never filed a partnership tax return. However, the individual returns filed by George, Glen, and Lyle Waters have attached to them a common Schedule F which indicates that the three brothers are engaged in a joint enterprise farming operation and that all profits and losses are split equally between the three brothers. Taxes have been incurred and paid in equal amounts by each of the three brothers since 1976. The business of the partnership is farming, which primarily consists of row crops and livestock.

The testimony and exhibits show that at least since 1980 the three brothers have entered into business arrangements in the name of Waters Brothers. Prior to 1985, all government program enrollment forms were in the name of Waters Brothers. There is also evidence to show that farm suppliers, such as FS Farm Services, billed the brothers for farm products in the name of Waters Brothers. There are invoices from Parker Livestock Supply, Inc. which show that livestock supplies were purchased in the name of Waters Brothers. There is an invoice from New Liberty Livestock Auction which shows that livestock was sold by the three brothers and the owner of the livestock was designated as Waters Brothers. Likewise, various farm equipment was purchased from implement dealers in the name of Waters Brothers.

However, the brothers also did business in the collective names of George, Glen, and Lyle Waters. The sight drafts issued by Eastern Iowa Production Credit Association contain the names George, Lyle and Glen Waters. The sight drafts, which are "the functional equivalent to checks", were issued by the various brothers from this account to farm suppliers, landlords, utility companies, etc. Each of the three brothers is authorized to draw upon that account.

## DISCUSSION & CONCLUSIONS

### I. PCA CLAIM

There are a number of issues raised by the alleged partnership concerning the existence and validity of liens claimed by PCA as to the property which the Debtors claim is owned by the partnership. This Court assumes that the individual Waters

brothers share the same concerns, therefore the "Partnership" and the individuals will hereinafter be collectively referred to as the Debtors. The Debtors contend that all farming assets other than real estate belong to the alleged partnership and not to the individual brothers. They contend that there is no valid security agreement binding upon the "Partnership", and even if there is, it was not properly perfected, other requirements of Iowa Code § 554.9402 were not met, or no value was given. Additionally, the Debtors contest the type of collateral which is alleged by PCA to be covered by the security agreements if these agreements are in fact determined to be valid and enforceable.

PCA counters that the security agreements are binding upon the partnership, if a partnership really exists, and that the security interests were properly perfected. PCA alleges that the collateral descriptions on the security agreements are sufficient to cover the crops and crop proceeds, deficiency payments and other items in which PCA claims a security interest, regardless of the accuracy of the legal descriptions of the real estate contained in the security agreements and financing statements.

PARTNERSHIP

■ PCA alleges that a written partnership agreement was not entered into by the three Waters brothers until 1985 and the claim that they were engaged in a true partnership prior to that time is merely "a fraudulent scheme to defraud PCA." The Debtors contend that they have been operating as a partnership since 1976. The term "partnership" is not defined in the Bankruptcy Code of 1978. Therefore, the Bankruptcy Court must look to the law of the state where the alleged partnership is domiciled to determine whether there is in fact a partnership. 9 Am.Jur.2d *Bankruptcy* § 214 (1980).

■ The Iowa Code defines partnership as "an association of two or more persons to carry on as co-owners a business for profit." Iowa Code § 544.6(1) (1987). A written partnership agreement is not required and the terms of the partnership agreement may be inferred or established from the acts of the parties. *Medd v. Medd,* 291 N.W.2d 29, 34 (Iowa 1980). Under Iowa law, the "crucial test" of partnership is intention to associate. *Chariton Feed and Grain, Inc. v. Harder,* 369 N.W. 2d 777, 785 (Iowa 1985), citing *Florence v. Fox,* 193 Iowa 1174, 1178, 188 N.W. 966, 967 (1922).

Evidence of an intent to associate may include a partnership name, a partnership bank account, partnership tax returns, and division of profits and losses. *See Butler v. Lloyd,* 230 Iowa 422, 297 N.W. 871 (1941). A partnership may in fact operate under more than one trade name. 59A Am.Jur.2d *Partnership* § 287 (1987). However, the legal name of a partnership is the name designated by a general partnership agreement, where one exists. Richard E. Dole, Jr. *The Fundamentals of Article 9 of the Uniform Commercial Code,* (1982).

In this case, Lyle, Glen and George Waters completed PCA loan applications in the name of Waters Brothers. The loan applications contain a line for the name of the borrower; in each of the four loan applications in evidence, the borrower is designated as Waters Brothers. On the application there are also boxes to check to indicate whether the borrower is married, unmarried, separated, partnership, corporation or other. On two of the applications the box indicating partnership contains a "x." The remaining applications are not marked. The loan applications also contain a Section G which is headed "Partnerships, Corporations, Trust and Other Legal Entities use this space"; that section asks for the name of the entity and the list of partners or officers and directors. In the 1984 application, the name of the entity is listed as Waters Brothers and in the section for the list of partners or officers and directors, the names George Waters, Lyle Waters and Glen Waters are listed.

Although the parties did not file a formal partnership tax return, the individual returns filed by George, Glen and Lyle Waters show that there was an equal division of profits and losses. As indicated, the evidence also shows that there was a joint

bank account in the names of all three brothers. Farm products were sold and purchased in the name of Waters Brothers, and farm equipment, including large items such as combines, was purchased in the name of Waters Brothers. Finally, as of the spring of 1985, there was a written partnership agreement entered into by George, Lyle and Glen Waters.

This Court finds that George, Lyle and Glen Waters have been engaged in business as a partnership since 1976 and that the legal name of that partnership is Waters Brothers. There is no evidence that the Debtors were involved in a fraudulent scheme to defraud PCA by holding themselves out as a partnership. The earliest loan application introduced into evidence by PCA, that dated November 17, 1982, but signed on March 14, 1983, clearly shows the name of the borrower to be Waters Brothers and further shows that the legal entity is a partnership. Thus, this Court cannot discern how PCA can claim the Waters brothers are engaged in a fraudulent scheme in 1987 when in fact all of the loan applications introduced into evidence by the PCA shows the name of the borrower to be Waters Brothers.

This Court also believes there is substantial evidence to support a finding that the name of the partnership is Waters Brothers. Most compelling is the fact that the written partnership agreement which was entered into in 1985 uses that name for the partnership. Moreover, there are numerous documents in the record which were executed prior to 1985 which also use that name. As indicated, the loan applications with PCA all use the name Waters Brothers, contracts for government programs prior to 1985 use the name Waters Brothers, equipment was purchased in the name of Waters Brothers, livestock was sold in the name of Waters Brothers, and farm suppliers issued invoices in the name of Waters Brothers. However, this Court also believes that the partnership has carried on business at various times in the joint name of "Glen, Lyle and George Waters." This is evidenced by the fact that sight drafts drawn upon the PCA account use that name. These sight drafts appear to have been issued in payment of routine farming expenses, which means they would have been widely circulated as part of the farming operation. Consequently, it appears that the Waters Brothers partnership used the joint name of "Glen, Lyle and George Waters" interchangeably with Waters Brothers for the transactions of partnership business; in essence, "Glen, Lyle and George Waters" was a trade name for Waters Brothers Partnership.

■ Iowa Code § 544.8 states that "all property originally brought into the partnership stock or subsequently acquired by purchase or otherwise, on account of the partnership, is partnership property." The most important consideration in determining what is partnership property is the source of funds from which the property is acquired. *Lamp v. Lempfert*, 259 Iowa 902, 146 N.W.2d 241 (1966). If property is purchased through partnership funds, the property is that of the partnership, even if title is taken in the name of one partner alone. *Id.* at 245. Additionally, consideration has been given to the manner of keeping records, how the repairs, improvements and taxes have been paid, the disposition of the income generated, and the general surrounding circumstances regarding the situation of the parties. *Id.*

The Debtors in this case had a partnership bank account and loan checks were made out to Waters Brothers. The brothers testified that all PCA loan proceeds went into the partnership account. All operating expenses have been paid out of the partnership account. All of the evidence shows that purchases of farm assets have been made with partnership funds; therefore, this Court finds that all farming assets are property of the partnership, with the exception of the real estate owned in individual names.

SECURITY AGREEMENT AND PERFECTION

The Debtors allege that there is no security agreement between PCA and Waters Brothers, a partnership. Under Iowa law "a security agreement is effective according to its terms between the parties,

against purchasers of the collateral, and against creditors." Iowa Code § 554.9201 (1987). The agreement must be signed by the debtor. Iowa Code § 554.9203(1)(a) (1987). The security agreements which PCA introduced into evidence in support of its claim are identified above. The security agreements dated March 14, 1983, and January 19, 1984, both list the debtor as Waters Brothers. The agreements dated November 11, 1980, and December 8, 1981, identify the debtors as George and Teresa Waters, Lyle Waters and Lisa Baum–Waters, and Glen Waters and Lori Waters. The security agreement dated December 27, 1984, identifies the name of the debtor as George, Lyle O. and Glen L. Waters, the trade name of Waters Brothers. Each of the security agreements is signed by the three Waters brothers and their wives.

The Debtors argue that since none of the security agreements specifically identify the debtor as a partnership, all of the security agreements are ineffective for purposes of creating a valid security interest in any of the property described in the security agreements. This Court finds the arguments of the Debtors to be unpersuasive. Clearly, two of the security agreements, those dated March 14, 1983, and January 19, 1984, identify the debtor as Waters Brothers. There is no reason to believe that PCA and the Debtors intended that name to mean anything other than Waters Brothers partnership. Each of those security agreements is signed by George, Lyle and Glen Waters, all of the general partners.

The question of whether the other three agreements which do not contain the name Waters Brothers are effective to bind the partnership must be resolved on the basis of the intent of the parties. This Court concludes, based upon the evidence and testimony, that it was clearly the intent of the three brothers to pledge all of the assets contained in the security agreements signed in the trade name and individually as collateral for the PCA loans. Since all of the partners entered into the security agreements, the agreements would be effective to create a security in-

terest as between the partnership and PCA. The intent to pledge partnership assets was clearly evidenced and the agreements were signed by all the partners. In *Murray v. Conrad,* 346 N.W.2d 814 (Iowa 1984) the Iowa Supreme Court held that when an authorized principal of a company executes a security agreement, the absence of the true business name should not defeat the security interest as between the parties to that agreement. *See also* 59A Am.Jur.2d *Partnership,* § 1287 (1987).

The next question to be answered is whether the signatures on the security agreements are sufficient to bind the partnership. The signature requirements of financing statements and security agreements serve different functions. "[T]he debtor's name on the financing statement generally prevents misfiling and establishes who the debtor is." White, L.C. and Summers, O.W. *Handbook of the Law Under the Uniform Commercial Code,* 913 (2nd Ed.1980). The signature on the security agreement is a statute of frauds requirement. *Id.* Consequently, case law has generally held that absence of the true business name does not defeat the security interest when the agreement is signed by an authorized principal of the company. *In re Mid–Atlantic Piping Products of Charlotte, Inc.,* 24 B.R. 314 (Bankr.W.D.N.C. 1982) (Security agreement valid where signature was not accompanied by the corporate debtor's name or address or by any express reference to any official or representative capacity); *In re Reid Communications, Inc.,* 21 U.C.C.Rep. 1436 (Bankr. W.D.Va.1977) (Security agreement signed by the vice president of a corporation without indication of his official capacity held valid); *In re A & T Kwik–N–Handi, Inc.,* 12 U.C.C.Rep. 765 (Bankr.M.D.Ga.1973) (Security agreement signed by corporate officer without indication of his official capacity held valid; also, name of debtor listed without any indication it was a corporation); *In re Bro Cliff, Inc.,* 8 U.C.C. 1144 (Bankr.W.D.Mich.1971) (Signature adequate to bind corporation where authorized officer signing president's name did not

identify corporation, himself, or his authority).

The preceding line of cases has been followed by the Iowa Supreme Court in *Murray v. Conrad*, 346 N.W.2d 814 (Iowa 1984). In that case, the security agreement was signed by Gerald L. Conrad, Barbara K. Conrad, and Gerald L. Conrad d/b/a Conrad Distributing. Gerald L. Conrad was the sole owner of a corporation named Conrad Distributing, Inc. One of the issues addressed by the Iowa Supreme Court was whether that security agreement was effective as against the corporation, Conrad Distributing, Inc. In holding that the security agreement was valid and enforceable as to Conrad Distributing, Inc., the Iowa Supreme Court stated:

> First, the law permits a finding that when Gerald L. Conrad signed the security agreement for Conrad Distributing he was signing for C.D.I. [Conrad Distributing, Inc.] in his capacity as sole owner and controlling officer of the corporation. The formal requisites of a security agreement are "in the nature of a Statute of Frauds." U.C.C. § 9–203 comment 5 (1978). Courts thus distinguish between the function of financing statements and security agreements:
>
>> Section 9–402 requires that the financing statement include the name, as well as the signature of the debtor. The inclusion of the debtor's name on the financing statement generally prevents misfiling and establishes who the debtor is. The security agreement signature requirement, on the other hand, is primarily a statute of frauds. *Thus, when an authorized principal of the company has executed a security agreement, the absence of the true business name should not defeat the security interest.* Of course, the business representative's signature will not always operate to bind his principal. Such issues will turn an [sic] agency, corporation, and partnership law applicable to secured transactions through 1–103.
>
> (Emphasis added). J. White and R. Summers, *Handbook of the Law Under the*

*Uniform Commercial Code* 913 (2d ed. 1980). *Id.* at 819.

This Court must look to the intent of the parties to determine whether George, Lyle and Glen Waters intended to bind the partnership when they signed the security agreements. *Murray* 346 N.W.2d at 814. The evidence in this case that the proceeds of all PCA loans went into the partnership bank account and were used to purchase partnership assets demonstrates that it was the intent of the parties at all times to operate as a partnership, and by signing the security agreements the three brothers were pledging partnership assets. Accordingly, this Court finds that it was the intent of George, Lyle and Glen Waters to pledge partnership assets when the security agreements were signed and their signatures created valid security agreements between PCA and Waters Brothers Partnership.

■ Having determined that all of the security agreements introduced into evidence create valid security interests as between the partnership and PCA, the more troublesome issue is whether the security agreements were properly perfected. The Debtors claim that none of the security agreements, if valid, were properly perfected. The Debtors in this case, as debtors in possession under Chapter 11, have all the rights of a trustee under Title 11. 11 U.S.C. § 1107. The trustee under Title 11 would have all the rights of a hypothetical lien creditor and thus would be able to avoid any unperfected liens. Iowa Code § 554.9301(3). As stated in *Pearson v. Salina Coffee House, Inc.*, 831 F.2d 1531, 1532 (10th Cir.1987):

> The Bankruptcy Code confers on a trustee in bankruptcy the same rights that an ideal hypothetical lien claimant without notice possesses as of the date the bankruptcy petition is filed. 11 U.S.C. § 544(a). Section 544(a) allows the trustee to avoid any unperfected liens on property belonging to the bankruptcy estate. Under this provision, SCH will be an unsecured creditor in the debtor's bankruptcy unless its security interest in the debtor's furnishings and equipment was properly perfected.

The formal requirements of a financing statement pursuant to § 554.9402(1) of the Iowa Code are as follows:

A financing statement is sufficient if it gives the names of the debtor and the secured party, is signed by the debtor, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor and contains a statement indicating the types, or describing the items of collateral ... When the financing statement covers crops growing or to be grown, the statement must also contain a description of the real estate concerned ... A copy of the security agreement is sufficient as a financing statement if it contains the above information and is signed by the debtor.

Two other Code provisions relax these requirements to some extent. Iowa Code § 554.9402(8) provides: "A financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading." Iowa Code § 554.9110 provides: "For the purpose of this Article any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described."

There are two financing statements at issue in this case. The first is the financing statement filed November 14, 1980, in the names of Waters, George and Teresa, Waters, Lyle and Lisa Baum, Waters, Glen and Lori. This financing statement covered all of the Debtors' livestock, grain on hand, all of the Debtors' feed for livestock, all of the Debtors' farm and ranch machinery and equipment, and all of the Debtors' crops now growing or hereafter to be grown. There is a real estate description included in that financing statement. The financing statement was amended by an amendment dated January 16, 1985, which added:

"all harvested crops, including but not limited to corn, grain sorghum, wheat, soybeans which Debtor owns or hereafter acquires in inventories, and any doc-

uments of title covering the crop with a negotiable or non-negotiable, including any warehouse receipt and any letter of entitlement issued by the Commodity Credit Corporation. All existing inventory of livestock held for resale and any and all other inventory."

That amended financing statement was timely continued on September 27, 1985. The second financing statement at issue is a non-standard financing statement which was created by filing on August 29, 1986, the security agreement dated January 19, 1984, which identifies the debtor as Waters Brothers.

■ The Debtors contend that the original financing statement filed on November 14, 1980, and the non-standard filing of August 29, 1986, are defective for the following reasons: (1) the name of the debtor is seriously misleading on both documents in violation of Iowa Code § 554.9402, and (2) they were not signed by anyone in a partnership capacity. Iowa Code § 554.9402(7) provides that:

A financing statement sufficiently shows the name of the debtor if it gives the individual, partnership or corporate name of the debtor, whether or not it adds other trade names or the names of partners. Where the debtor so changes the debtor's name or in the case of an organization its names, identity or corporate structure that a filed financing statement becomes seriously misleading, the filing is not effective to perfect a security interest in collateral acquired by the debtor more than four months after the change, unless a new appropriate financing statement if filed before the expiration of that time.

This case does not involve a name change. There were no written documents designating a partnership name until 1985. The name of the debtor for purposes of satisfying the requirements of the Iowa Code is Waters Brothers. *See Matter of Leichter*, 471 F.2d 785 (2nd Cir.1972). Therefore, a comparison must be made between the legal name of the partnership and that listed on the financing statements

to determine whether the financing statements are "seriously misleading."

The cases addressing the issue of "seriously misleading" names on financing statements have reached widely divergent results. The Court in *Matter of Platt*, 257 F.Supp. 478 (E.D.Pa 1966) held that a listing under the name "Platt Fur Co." was not seriously misleading when the name should have been "Henry Platt." However, the court in *In re Tyler*, 23 B.R. 806 (Bankr.S.D.Fla.1982) found the discrepancy between "Tri–State Moulded Plastics, Inc." and "Tri–State Molded Plastics, Inc." to be seriously misleading.[1]

There are a number of cases falling somewhere between *Platt* and *Tyler* which seem to turn on the specific factual circumstances involved. This case, then, must be decided on its own facts, keeping in mind that the key is whether a potential creditor would have been misled by the debtor's name as listed on the financing statement. *Matter of Glasco*, 642 F.2d 793, 796 (5th Cir.1981). "[T]he validity of a financing statement depends primarily on its ability to give notice of the secured interest to other creditors." *Matter of Rieber*, 740 F.2d 10, 12 (8th Cir.1984).

In *Pearson v. Salina Coffee House, Inc.*, 831 F.2d at 1531, the legal name of the debtor was Beacon Realty Investment Company of Salina. Beacon Realty Investment Company of Salina was a partnership that owned a Hilton Inn franchise. The financing statement in question was filed only under the name Hilton Inn. The court found the evidence showed the partnership never conducted business in the partnership name, but always in the trade name of Hilton Inn, and that, in fact, the secured creditor was unaware of the existence of the partnership and assumed that Hilton Inn was the legal entity. The court held that the security interest was unperfected since filing under Hilton Inn was seriously misleading when the legal name of the debtor was Beacon Realty Investment Company of Salina. The court held that it

was not inequitable or unduly harsh to require the secured creditor to ascertain the true legal name of the debtor. The court stated that "while the fact no other creditor was actually misled in this case makes the result seem harsh, we are equally mindful of mischief that would be created by allowing the trade name filing to be sufficient for perfection." *Pearson*, 831 F.2d at 1536. The court noted there was no similarity between the name of the partnership and the trade name Hilton Inn. The court held that the filing under the name Hilton Inn could not be considered a minor error and was seriously misleading because a potential creditor of Beacon Realty Investment Co. searching the index under that name would be unable to find a notice of the security interest since it would be indexed under Hilton Inn. *Pearson*, 831 F.2d at 1536.

The resolution of the "seriously misleading" question requires more than just the comparison of two names. One must consider the operation of the U.C.C. indexing system, including the size of the index and the distinctiveness of the names involved. *In re McGovern Auto Specialty, Inc.*, 51 B.R. 511, 514 (Bankr.E.D.Pa.1985). The index may contain hundreds of names, or even millions depending on whether the searcher is in New York or a small Iowa county. The file box method whereby a searcher riffles through a drawer full of cards has become outmoded and the use of computers has become more popular and efficient. *Id.* Admittedly, a computer search may require more precision in requesting a name search. The entry of a single name into the computer system may retrieve only a listing of financing statements on which the name is *identical* to the name entered. *Id.* The non-standard financing statement filed August 29, 1986, clearly puts all parties on notice that PCA is claiming a security interest in assets owned by Waters Brothers. As previously discussed, the security agreement attached to that financing statement constitutes a valid and binding obligation of the partner-

---

1. In *Tyler*, a corporate name change was filed by the company after financing statements were filed. The creditor knew of the name change, but failed to file new financing statements reflecting the name change.

ship. This Court does not believe anyone could seriously argue that he/she would be misled in anyway by the omission of the word "partnership" in the financing statement. Even the partnership agreement executed in the Spring of 1985 by the three brothers lists the name of the partnership as Waters Brothers and not Waters Brothers Partnership. Consequently, this Court finds that the filing of the security agreement dated January 19, 1984, as a non-standard filing on August 29, 1986, validly perfects PCA's interest in the collateral which is set out in that security agreement.

■ Even though this Court has found the non-standard financing statement filed August 29, 1986, perfects the PCA's interest in certain assets of Waters Brothers Partnership, the financing statement filed on November 14, 1980, arguably covers more property than the non-standard financing statement. Accordingly, this Court is required to analyze whether the financing statement filed on November 14, 1980, perfects the PCA's security interest in assets of the Waters Brothers Partnership.

The issue which must be addressed is whether the 1980 financing statement is so seriously misleading that a prudent creditor conducting a reasonable search would fail to discover that the financing statement covers the assets of Waters Brothers Partnership. In essence, this Court must answer the question of whether the hypothetical creditor (or more likely the purchaser of grain or cattle) who does a lien search with the Iowa Secretary of State under the name Waters Brothers Partnership would find the 1980 financing statement and if, when found, would realize that the 1980 financing statement was intended to cover partnership property. In several of the cases cited above, there was evidence presented at the hearing on the issue of whether in fact a lien search under the name of the partnership would have generated from the appropriate filing agency the financing statement in dispute. Unfortunately, no evidence has been presented in this case as to what would have been received from the Iowa Secretary of State

had a lien search been done in the name of Waters Brothers Partnership.

Based upon a review of the applicable authorities and the documents in question, this Court must conclude that the 1980 financing statement is in fact seriously misleading. The financing statement contains not only the names of the three individual partners but also the names of their respective wives. A clear trend in the more recent cases is to require greater precision in listing the name of the debtor on a financing statement. That trend likely results from the increased reliance upon computers in filing and indexing financing statements. This Court has serious doubts that a computer search of Waters Brothers Partnership would have generated a financing statement in the name of the three individual brothers and their respective wives. Even if a prudent creditor had found that financing statement, that creditor could easily conclude that the financing statement was intended to pledge only personal assets since the wives names were included as well as the individual brothers names. Accordingly, this Court must conclude that the 1980 financing statement is seriously misleading.

■ The Debtors claim that even if the names on the financing statements are not seriously misleading, the financing statements are nonetheless insufficient to perfect the security interest in partnership property because they were not signed by anyone in a partnership capacity. As indicated previously, the 1980 financing statement has been found to be seriously misleading and the only valid financing statement which perfects PCA's interest is the 1986 filing of the January 19, 1984 security agreement. The January 19, 1984 security agreement has been found to have been validly executed by the partnership. However, this Court perceives that the Debtors are arguing there is different or more stringent signature requirement on a financing statement than on a security agreement.

Case law has held, generally, that if there is sufficient proof that the person signing the financing statement was autho-

rized to do so, then the requirement that the statement be signed by the secured party is satisfied. *In re Williams*, 16 U.C. C.Rep. 240 (Bankr.N.D.Ala.1974) (Name of corporate secured party did not appear on signature line and only signature was that of an officer of the secured party without designation of official title); *In re Bengtson*, 3 U.C.C.Rep. 283 (D.Conn.1965) (Signature did not indicate official title of party nor did the corporate name appear on the signature line). In this case, all three Waters brothers signed the security agreement which serves as the non-standard financing statement. As George, Lyle, and Glen Waters are the only members of the partnership, their signatures are clearly binding upon the partnership. This Court therefore finds the non-standard financing statement filed on August 29, 1986, meets the requirements of Iowa Code § 554.9402 and properly perfects PCA's security interest in property of the partnership.

■ Finally, the Debtors argue that PCA gave no value to the partnership for the security interest. This Court finds that argument to be without merit. The evidence shows that there are at least three promissory notes in the name of Waters Brothers Partnership (Exhibits B–4, B–5, & B–7). Exhibit B–7, which is the note dated May 31, 1985, in the principal sum of $295,-000, specifically has typed above the signature lines "Waters Brothers." In addition, the Debtors testified that all of the proceeds from the PCA loans went into the partnership bank account. Consequently, this Court can find no merit in the argument that there was no consideration given for the security agreements.

## COLLATERAL COVERED BY PCA'S SECURITY AGREEMENT

Having determined that a true partnership exists and that the non-standard August 19, 1986, financing statement filed by PCA properly perfects its security interest in property of the partnership, this Court must now determine exactly what property is covered by the security agreement. Iowa law determines the extent of PCA's lien. *Matter of Chaseley's Food, Inc.*, 726

F.2d 303 (7th Cir.1983). A security agreement is not enforceable and may not "attach" unless it includes a description of the collateral. Iowa Code § 554.9203 (1987). Sections 554.9110 states that "any description of personal property ... is sufficient whether or not it is specific if it *reasonably identifies* what is described." (Emphasis added). Additionally, when the security interest covers crops growing or to be grown a description of the land concerned must be included. Iowa Code § 554.9203(1)(a) (1987).

### Growing Crops

The Debtors contend that the security agreement does not cover growing crops and even if it does, the real estate descriptions are largely incorrect and at most, PCA would have a security interest only on the crop grown on the correctly described real estate. PCA counters that the reference to feed and grain in the January, 1984, security agreement is synonymous with crops, and because the security agreement pledges crops growing or to be grown, PCA's lien attached to the Debtors' crop. Additionally, PCA alleges that to the extent the real estate descriptions are erroneous, it was a mistake or fraud on the part of the Debtors and the security agreement should be reformed. PCA also argues that even if the real estate descriptions are erroneous, they were not necessary for the security agreement to attach to the severed crops. Lastly, PCA contends the mortgages covering the property upon which the crops were grown grants to the PCA a validly perfected lien in those crops.

### A. PCA Security Agreement Covers Growing Crops

This Court must determine whether the security agreement is clear on its face or whether it is ambiguous. Where the terms of a writing are clear and unambiguous, there is no room for construction or interpretation by the court. *Vincent v. Kaser Const. Co.*, 255 Iowa 1141, 125 N.W.2d 608 (1963). The parol evidence rule forbids the use of extrinsic evidence to vary or contradict a written agreement. Application of the rule was thoroughly discussed by the

Supreme Court of Iowa in the case of *Hamilton v. Wosepka*, 261 Iowa 299, 154 N.W.2d 164 (Iowa 1967). Broadly speaking, the question in *Hamilton* was whether oral testimony was properly received for the purpose of interpreting, as opposed to varying, the terms of a written contract. The court held that extrinsic evidence, confined to the purpose of interpretation, was admissible. *Hamilton*, 154 N.W.2d at 168. The parol evidence rule essentially allows evidence to aid in determining the *meaning* of the written contract.

In this case, there is a signed security agreement that describes the collateral. The issue is the adequacy of the description. Extrinsic evidence is admissible to discover the actual intent of the parties regarding the creation of a security interest in the Debtors growing crops. "Extrinsic evidence that throws light on the situation of the parties, the antecedent negotiations, the attendant circumstances and the objects they were thereby striving to obtain is necessarily to be regarded as relevant to ascertain the actual significance and proper legal meaning of the agreement." *Hamilton* 154 N.W.2d at 168. *See also FD & S v. United States*, 574 F.Supp. 699 (S.D.W.Va.1983). (Parol evidence rule does not exclude admission of extrinsic evidence to clarify ambiguous collateral description in ambiguous security agreement).

Regardless of whether § 9–203 is "in the nature of a Statute of Frauds," as stated by the Official Comments, Comment 5, parol evidence is admissible for the limited purpose detailed above. It may not, of course, be considered to vary, add to or subtract from the written security agreement. "Neither the statute of frauds nor the parol evidence rule precludes the introduction of parol evidence to prove that the written memorandum is inaccurate or incomplete." 73 Am.Jur.2d *Statute of Frauds*, § 606 (1974).

▮ The Court is not convinced that the security agreement is clear and unambiguous on its face as to "growing crops." It appears that the items listed under "Feed and Grain as follows" are intended to be severed crops and not growing crops because of the notations of specific bushel amounts. However, a real estate description is listed which seems to indicate an intention to secure growing crops. Therefore, to the extent ambiguity is a prerequisite to the allowance of parole evidence, the Court finds that the document is ambiguous. *See Hamilton*, 154 N.W.2d at 171, 172.

▮ In resolving the ambiguity in favor of PCA, i.e., the security agreement was intended to cover growing crops, the Court relies on the following evidence:

1) The original U.C.C. financing statement filed on November 11, 1980, states that it "covers the following types ... of property: All of the Debtors' crops now growing or hereinafter to be grown."

2) While the PCA security agreements are not a model of clarity, it is clear from the earlier security agreements, those executed in 1980, 1981, and 1983, that a security interest in growing crops was indicated on the security agreement by inserting a legal description under the paragraph which started "if crops ..." The PCA form appears to have been modified sometime after the March 14, 1983 security agreement was executed. However, the PCA continued to show a security interest in growing crops by inserting a legal description in paragraph 2 of the security agreement which was headed: "LAND: if the collateral is crops or fixtures, it is and will be located on the following described real estate: ..." Thus, this Court concludes that it was always the intention of PCA to take a security interest in growing crops and it was only the change in the format of the PCA's security agreements that created the confusion in the 1984 security agreement.

3) A real estate description is included on the security agreement designating where the crops are to be grown.

4) Crops are a substantial source of income to the Debtors. The cash flows attached to the loan applications (signed by the three brothers) clearly show the

crop income as a source of repayment of the PCA debt.

5) All three brothers are either college graduates or have several years of college courses. Glen Waters worked as a loan officer for PCA for approximately 20 months preparing financial documents for PCA borrowers. Despite Glen Waters testimony that they did not intend to grant a security interest in growing crops, the Debtors either knew or should have known that real estate descriptions are provided for purposes of securing growing crops and it is common for creditors to require a security interest in growing crops when making loans to finance farm operating expenses.

6) The Debtors listed on various loan applications the number of acres assigned to corn and beans as well as expected yields. This is indicative that the PCA was to rely on crop income for repayment of the loan and it is unlikely the parties did not intend to grant to PCA a security interest in the growing crop.

## B. Adequacy of Legal Descriptions

■ Debtors argue that even if growing crops are covered by the security agreements, not all crops are covered since there are errors in the legal descriptions contained in the security documents. Section 554.9402(1) provides that when a financing statement covers growing crops the financing statement must contain a description of the real estate concerned. A description containing minor errors will not be held invalid unless it is seriously misleading. Iowa Code § 554.9402(8) (1987).

The Iowa Supreme Court addressed the question of "seriously misleading" real estate descriptions in *First National Bank in Creston v. Francis*, 342 N.W.2d 468 (Iowa 1984). In that case, the bank was granted a security interest in the debtors' crops. The real estate description provided on the security agreement and financing statement was "the southeast ¼ of Section 24, Township 71 North, Range 32 in Grant Township, Adams County, Iowa." The description erroneously stated Section 24 in-

stead of Section 25, the correct section. The court found that the description was seriously misleading because it was so specific that it could only be read by a reasonable third party to secure those crops in Section 24. The court stated that "[n]othing in the bank's description would have caused the cooperative or some other person checking the record to suspect the section number was wrong or that the bank intended to encumber crops on other land." *Francis*, 342 N.W.2d at 471. While the court noted that it was not implying that an exact legal description of the real estate be given, it appears that the more specific and detailed the property description, the more likely an error would be seriously misleading.

In the case at bar, a detailed plot was prepared by a land surveyor which identified the properties actually owned or rented by the Debtors and those properties which are included in the legal description set out in PCA's financing statement (that is the January 19, 1984, security agreement which was filed as a non-standard financing statement in August, 1986). The plot clearly shows that the PCA legal description covers only part of the land which is farmed by the Debtors while, at the same time, describes land in sections where no farming was conducted by the Debtors. This case is similar to the *Creston* case in that the PCA legal description is very specific and uses seriously erroneous descriptions of quarter sections and townships. PCA's security interest is perfected only in crops growing or which have been grown on real estate that is correctly described in the PCA financing statement.

## C. Severed Crops Issue

■ PCA argues that even if the real estate descriptions are erroneous in part, it is irrelevant since the crops which generated the cash collateral have been harvested and should therefore be considered severed crops. PCA cites the case of *In re Roberts*, 38 B.R. 128 (Bankr.D.Kansas 1984) as support for its position. In *Roberts*, the financing statement filed by the creditor having a security interest in growing crops omitted any description of real estate.

However, a security interest was also granted in "farm products." The Court held that severed crops are no longer "growing crops", but rather are "another subcategory of farm products." *Id.* at 133. Therefore, the real estate description requirement was inapplicable.

This Court has serious reservations about the holding in the *Roberts* case. Real estate descriptions are required to put third parties on notice that the crops growing on that particular parcel of land are encumbered. All growing crops eventually become severed crops. Why require a legal description if it will eventually be unnecessary? Creditors could routinely file financing statements without real estate descriptions and after the crop is severed, claim perfection in any and all crops produced by the debtor. Further, to follow the *Roberts* decision would mean that a secured creditor who properly provided a real estate description on its financing statement could be challenged, once a growing crop is severed, by a second creditor secured only in "farm products" having no property description. Iowa Code § 554.9312(5) establishes priority of conflicting security interests according to time of filing financing statements. Consequently, the creditor properly perfected in growing crops who had included an accurate legal description in its financing statement would lose its priority upon harvest to another creditor who had a security interest in crops (and no legal description) provided that creditor had filed its financing statement before the creditor who had included an accurate legal description. Since it is extremely rare to ever sell growing crops, that is, the crops are almost always harvested prior to sale, it would appear that the *Roberts* ruling would render the legal description requirement a nullity.

This Court is aware, however, that two very recent cases have adopted the *Roberts* approach. In *United States v. Smith*, 832 F.2d 774 (2nd Cir.1987) the Farmers Home Administration (FmHA) had a security interest in all crops, as well as other farm products. As in the case at bar, a large portion of the crops on hand at the time the debtors filed bankruptcy were grown on land which was not described in the FmHA financing statement. The court quoted the *Roberts* case with approval and concluded that the FmHA lien attached to the crops when they were harvested under the after acquired farm products clause of the security agreement. The appellate court acknowledged some of the concerns expressed above and indicated that some of those concerns would be alleviated by § 9–312(2) of the U.C.C. (Iowa Code § 554.9312(2)) which grants a special priority to those creditors who give new value for purposes of producing a growing crop.

A second recent case which has followed the *Roberts* line of analysis is *Bank of Cresbard v. Lindhorst Farms, Inc.* 78 B.R. 1002 (D.S.D.1987). In that case a bank was claiming a security interest in certain harvested crops. The financing statement upon which the bank relied did not contain any legal description of the property upon which the crops were grown. However, the financing statement did include "... all farm products, including but not limited to crops, supplies, used or produced in farming and feeding operations, feeds kept and stored in connection therewith, contract rights, accounts, and all proceeds ..." *Cresbard*, 78 B.R. at 1004. The *Cresbard* court followed the *Roberts* analysis in holding that the grant of a security interest in all farm products included severed crops. *See also Matter of Nave*, 68 B.R. 139 (Bankr.S.D.Ohio 1986).

The cases which have held that the general phrase "all farm products" covered severed crops regardless of whether the security agreement and financing statement contained an accurate description of the real estate upon which the crops are growing are distinguishable from the case at bar. In this case, there is no inclusion of "all farm products." The security agreement signed by the Waters brothers states only: "LAND: if the collateral is crops or fixtures, it is and will be located on the following described real estate ..." Inserted in that section is the legal description which has previously been referred to. There is no language in the security agree-

ment which speaks of "all farm products," "all crops," or any other such terminology which could be construed to cover all of the Debtors' crops, including severed crops. The security agreement, by its own terms, limits the security to those crops grown on the described real estate. Even if the *Roberts* line of cases is followed, the PCA is perfected in only those crops grown upon the described real estate.

This Court has been unable to find any Iowa case which directly addresses the severed crops issue as discussed in the *Roberts* line of cases. However, in *First National Bank in Creston v. Francis*, 342 N.W.2d at 468 the Iowa Supreme Court did find that a bank which had not set out a correct legal description in its security agreement and financing statement did not have a validly perfected security interest in the debtors' crops. The issue of whether the security agreement attached to the crops when they were severed was not directly addressed by the Iowa Supreme Court in that decision, however, it is interesting to note that one of the defendants to the bank action is a grain elevator which had purchased part of the debtors harvested crops. Therefore, it is clear that the crops had been harvested and, in fact, sold prior to the commencement of the action. In the *Creston* case, the security agreement covered growing crops and proceeds of certain described land. The Iowa Supreme Court found that the legal description was in error and therefore the security interest was unperfected. As in the *Creston* case, the security agreement in the case at bar only covers crops and proceeds grown upon specifically described real estate. The facts of the case at bar do not differ substantially from the facts of the *Creston* case. Consequently, the *Creston* case is further support for the proposition that PCA is only perfected as to those crops which were grown upon the property described in the security agreement and financing statement.

### D. Does the PCA Mortgage Cover Growing Crops?

The PCA contends that the crops are subject to the rents and profits pledge in the real estate mortgage granted to the PCA and therefore are secured collateral of the PCA. The PCA filed a foreclosure action and requested the appointment of a receiver prior to the filing of the bankruptcy petition. This Court concludes based upon a review of the recent Iowa Supreme Court case of *Federal Land Bank of Omaha v. Lower*, 421 N.W.2d 126 (Iowa 1988) and the Federal District case of *Federal Land Bank v. Harry R. Terpstra, Trustee (In re Minnie Ella Porter)*, 90 B.R. 399 (N.D.Iowa 1988), the applicable provisions of the U.C.C. control the procedure for perfecting a security interest in crops. Iowa Code §§ 554.9203, .9402(1), and .9402(8). In *Federal Land Bank v. Lower*, 421 N.W.2d at 129, the Iowa Supreme Court held that where the granting clause of a mortgage grants the rent as part of the property securing the debt, the granting clause controls and the rents are thereby pledged as primary security for the indebtedness; the lien upon those rents, as between mortgagor and mortgagee, is effective from the date of the execution of the mortgage and not from the date on which a receiver is requested. The Iowa Supreme Court specifically did not reach the issue of whether the Bank's interest was perfected because it found as between the two parties a valid lien had arisen and therefore, the debtors had to account for the rents they received prior to the appointment of a receiver.

In *Federal Land Bank v. Harry R. Terpstra*, the District Court answered the unanswered question of *Lower* of when and how a lien on real estate rents is perfected. The District Court noted that *Lower* "establishes that the U.C.C.'s perfection requirements are not applicable to a lien on rents from real estate, it leaves unanswered the question as to what perfection method is available to a lender who has taken a security interest in those rents as primary security for the debt." The District Court concluded that Iowa Code §§ 558.1 & .41 were applicable and therefore, the filing of the instrument with the office of the county recorder where the land is situated perfects the interest. The

District Court stated that this imparted notice to the whole world. 90 B.R. at 404. The District Court concludes that "the decision is limited by and to the particular facts of this case. Because the U.C.C. has carefully crafted provisions concerning the granting and perfected of security interest in all other items of personal property (see § 554.9102 for the broad scope of Article 9), including crops (*which provisions are not implicated by the holding in this case*) this decision is of necessity quite narrow in its reach." (emphasis added) 90 B.R. at 404.

This Court concludes that the U.C.C. perfection provisions regarding a security interest in crops control and the *Lower* and *Terpstra* precedent are inapplicable to the issue of perfecting a security interest in crops.

The Debtors, as debtors-in-possession, under Chapter 11 have all the rights of a hypothetical lien creditor and thus would be able to avoid any unperfected liens. If the position espoused by the PCA is adopted, the potential lien creditor or local grain elevator, which purchases a farmers' grain, could not rely upon the records maintained by the Iowa Secretary of State to determine if any other creditor claimed a validly perfected lien in debtors' crop. Such a subsequent lien creditor would have to not only check the records of the Iowa Secretary of State to see if a validly perfected lien was filed under the U.C.C., but also would have to determine what ground the grain was grown upon and then check with the Clerk of Court in the county where the real estate was located to determine if a mortgage foreclosure had been commenced; and if commenced, whether the applicable mortgage documents contained the necessary language granting a security interest in grain. It is the belief of this Court that such a procedure was not intended by the Iowa legislature when the U.C.C. was enacted. Rather, the legislature has adopted a specific method of perfecting a security interest in crops under the U.C.C. It should be noted that this method of perfection could easily be complied with by any creditor, such as the PCA, simply by filing their mortgage as a non-standard U.C.C. filing with the Iowa Secretary of State (assuming the mortgage meets all the minimum requirements of a financing statement under the U.C.C.) or filing a standard U.C.C. to perfect the lien in crops.

This decision is not inconsistent with the decisions in either *Lower* or *Terpstra.* The *Lower* decision was very specific in pointing out that the grant of a security interest in cash rents was specifically excluded from coverage under the U.C.C. Clearly, the grant of a security interest and perfection of that interest in crops is covered by the U.C.C. *See,* Iowa Code §§ I.C. 554.-9102, 554.9109(3), 554.9402. The perfection of the PCA's interest in rents and profits upon either filing of the mortgage or commencement of the foreclosure and a request for appointment of receiver does not perfect an interest in the crops themselves. That interest in crops can only be perfected under the provisions of the Iowa U.C.C.

E. Fraud Allegations

 Finally, PCA makes the broad allegation that the incorrect legal description was the result of fraud and/or mistake and that the security agreement and financing statement should be reformed. However, PCA does not cite any evidence to support its fraud allegations, nor, can this Court find any support in the record. Further, even if the erroneous legal description in the financing statement results from a mistake between the parties, the PCA does not cite any authority to support the proposition that the financing statement upon which third parties rely can be reformed as to the hypothetical lien creditor. Consequently, there is no legal basis to support a reformation of the financing statement.

*Deficiency Payments and Contract Assignment*

 PCA claims a security interest in the Debtors' 1986 and 1987 deficiency payments under two theories. The first theory asserted by PCA is that deficiency program payments constitute accounts receivable or general intangibles. Secondly, or alterna-

tively, PCA claims that deficiency payments represent proceeds of crops, and since it has a security interest in crops, its interest continues in the proceeds.

Several cases have addressed the categorization of deficiency payments in conjunction with various security agreements. In *In re Nivens,* 22 B.R. 287, 289 (Bankr.N.D.Tex.1982), the bank held a security interest in the debtors crops as well as "all checks and income derived from farming." The security agreement did not specifically list government payments or deficiency payments. The court held that the bank's lien was perfected in the deficiency payments by virtue of its lien against "crops." In *In re Sumner,* 69 B.R. 758, 761 (Bankr.D.Or.1986), the debtor granted to Interstate Production Credit Association (IPCA) a security interest in "crops, all payments made as a result of an acreage allotment or set aside program which results in the Debtor's not planting a crop, and the proceeds therefrom." The court concluded that the deficiency payments were proceeds of the debtors' 1985–1986 crop and were covered by IPCA's security agreement. A case reaching the opposite result is *In re Kruger,* 78 B.R. 538 (Bankr.C.D.Ill.1987). In *Kruger,* neither the security agreement nor the financing statement referred to deficiency payments. *Kruger* 78 B.R. at 539. The security agreement only covered the corn crop and the proceeds thereof. After a thorough analysis of the nature of deficiency payments, the court held that they are not proceeds of crops. *See also Matter of Heims,* 65 B.R. 112 (Bankr.N.D. Iowa 1986) (Security agreement did not specifically mention deficiency payments, but did cover crops, contract rights and accounts, and proceeds from the contract rights and accounts. The Court found that the holding in *In re Sunberg,* 35 B.R. 777 (Bankr.S.D.Iowa 1983) that PIK payments were covered by the language "contract rights, accounts and general intangibles" should be equally applicable to deficiency payments.)

In none of the cases above did the security agreements and financing statements specifically refer to "deficiency payments." The analysis of whether the deficiency payments are crop proceeds or general intangibles results from the failure of the creditor to specifically describe government program payments or deficiency payments in the security agreement. In the case at bar, the security agreement dated January 14, 1984, which was filed as a non-standard financing statement on August 29, 1986, specifically states that it covers all "government subsidy payments of whatever kind or form, including but not limited to Payment-in-kind, storage, *deficiency,* and interest." (emphasis added). The security agreement also specifically covers all crop proceeds and general intangibles. Thus, under any definition of deficiency payments, they would be covered under the security agreement taken by PCA. It is therefore unnecessary for this Court to analyze the issue under the "crop proceeds" theory.

■ PCA is secured in both the 1986 and 1987 deficiency payments attributable to the land described in the January 14, 1984, security agreement. PCA does not have a valid security interest in any of the deficiency payments which are attributable to land which is not included in the legal description of the January, 1984 security agreement. The reference to deficiency payments, general intangibles, and crop proceeds all are included in the section which grants to PCA a security interest in the proceeds, disposition, and sale of secured property. Since PCA is only secured in those crops grown upon the described land, PCA can have a security interest only in the deficiency payments and other government program payments which are generated from that property.

■ Another issue relating to the PCA security agreement involves a contract compensation agreement entered into by Waters Brothers and PCA dated June 2, 1986. That agreement assigned to the PCA all of Waters Brothers rights in a contract with North American Seeds wherein Waters Brothers had contracted to grow and sell seed corn to North American Seeds. The contract is in the name of Waters Brothers and is signed by George

Waters. This Court knows of no reason why that would not be a binding obligation as between the partnership and the PCA. In addition, the PCA security agreement dated January 19, 1984, also covers contract rights arising out of the sale or disposition of secured grain.

The question of whether the contract compensation agreement is properly perfected turns upon the issue of where the seed corn was grown. As indicated previously, the PCA is perfected only as to proceeds and contracts which are attributable to or arise out of land described in the nonstandard financing statement filed in August, 1986. The testimony indicates the seed corn was grown on the Ward farm which is included in the legal description. Therefore, PCA has a validly perfected security interest in the contract proceeds.

*CRP Payments*

The PCA claims a security interest in the Conservation Reserve Program (CRP) bonus and contract payments on the basis of its interest in either general intangibles or contract rights. The Debtors contend that the CRP bid was not accepted by the ASCS county committee until approximately March 15, 1987, which was after the petition filing date of February 19, 1987. Therefore, they contend that the CRP proceeds are after-acquired property and the security interest of PCA is cut off by operation of 11 U.S.C. § 552. Additionally, the Debtors maintain that any attempt by PCA to gain a lien interest in the CRP payments would be avoidable as a preference under 11 U.S.C. § 547.

The CRP program arises out of 16 U.S.C. § 3831 (Supp. IV 1986). Subsection (a) states as follows:

> During the 1986 through 1990 crop years, the Secretary shall formulate and carry out a conservation reserve program, in accordance with this subchapter, through contracts to assist owners and operators of highly erodible cropland in conserving and improving the soil and water resources of their farms or ranches.

Pursuant to § 3833, in return for a ten year contract entered into by an owner or operator, the Secretary shall pay an *annual rental payment* in an amount necessary to compensate for conversion of highly erodible cropland to a less intensive use or retirement of any cropland base. The statute and regulations require that during the ten year term of the contract the landowner must not only remove the erodible land from production but must also use prescribed conservation practices.

Title 16 of the U.S. Code specifically designates these payments as rental payments. The regulations published at 7 C.F.R. Part 704 make numerous references to the CRP payments as "rent." See, e.g., § 704.2(a)(2). (" 'Annual rental payment' means the annual payment specified in the CRP Contract which is made to a participant to compensate such participant for placing erodible cropland in the CRP."); § 704.13(a)(2) (CCC is obligated to pay to the participant an "annual rental payment" pursuant to the contract); § 704.16(a) ("Annual rental payments shall be made in such amount and in accordance with such time schedule as may be agreed upon and specified in the CRP Contract"). These references to payments as rent together with the fact that the property owner and Department of Agriculture entered into a ten year contract in the nature of a lease agreement leads this Court to conclude that the CRP bonus and contract payments are in the nature of rental or lease payments.

It may be argued that cases such as *Matter of Sunberg,* 35 B.R. 777 (Bankr.S. D.Iowa 1983), aff'd 729 F.2d 561 (8th Cir. 1984) and in the *Matter of Schmaling,* 783 F.2d 680 (7th Cir.1986) are support for the proposition that the CRP Contract should be treated as a contract right which is included as a general intangible under the Uniform Commercial Code. However, the *Sunberg* and *Schmaling* cases dealt with the governments 1983 PIK program. As explained in *Sunberg* at 35 B.R. at 779, the PIK program provided for a payment-in-kind to farmers who agreed to withdraw their entire farm from production for one year. Unlike the PIK program, the CRP program is a long term contract with the

government which imposes upon the property owner continuing obligations not only to withdraw the property from production but also to engage in certain conservation practices.

The Iowa Supreme Court has construed the phrase "rents, issues, and profits" as follows:

> The phrase "rents, issues and profits" as distinguished from the land itself refers to the products of the land, the annual rentals, the income derived therefrom, whether in money or in products.... It has been said that "to cultivate and have the use of the lands is to receive the rents and profits." Where one by lease agrees to pay a certain sum for the right to cultivate and use the land, the sum so stipulated is rent, and represents the landlord's share in the issues and profits of the land, and where the lease provides for a share of the crop, the share of the crops represents the landlord's portion of the issues and profits derived from the use and cultivation of the land. Part of it may be paid in cash and part of it in crops or products.... The word "profits" as used in the phrase "rents, issues and profits" is synonymous with "rents."

*Equitable Life Ins. Co. of Iowa v. Brown,* 220 Iowa 585, 590, 262 N.W. 124, 127 (1935) (authorities omitted). Under that definition this Court is convinced that the annual rental payments received pursuant to the CRP Contract are in the nature of rents. Consequently, the grant of a security interest and perfection thereof interest is not governed by the Uniform Commercial Code. *See* Iowa Code § 554.9104(j) (1987).

The failure to treat the CRP payments as rents would create an untenable conflict between the mortgage holder and the lender who has taken a security interest pursuant to the U.C.C. in the Debtors' chattels. Once the CRP Contract is in place, the regulations require that if the property is sold or transferred, the new owner of the property has the right to terminate the CRP Contract, however, the original owner must refund to CCC all or part of the payments previously made pursuant to the CRP Contract. *See,* 7 CFR § 704.21. In the event of a bankruptcy or foreclosure of a security interest, it would be illogical for the chattel lien holder to have the right to receive the CRP payments while the land purchaser at a mortgage foreclosure sale could terminate the CRP Contract. Given the fact that the ultimate purchaser will be responsible for complying with the conservation practices pursuant to the CRP Contract, it certainly follows that the payments made pursuant to the CRP Contract should run with the land, as opposed to being considered a contract right which would be subject to another lender's U.C.C. security agreement.

In the case at bar, it has been established that the PCA holds mortgages executed by George A. Waters, Lyle O. Waters, and Glen L. Waters. These mortgages state that in the event of default the mortgagee may commence an action in foreclosure and secure the appointment of a receiver to take possession of the property as well as the rents and profits accruing therefrom. The PCA did commence a state court foreclosure action against the Waters brothers and requested appointment of a receiver in a counterclaim filed on November 13, 1986. However, state court proceedings were stayed by the Chapter 11 filings.

Under Iowa law, a mortgage pledge of rents becomes enforceable upon recording of the mortgage. *Federal Land Bank v. Harry R. Terpstra, Trustee (In re Minnie Ella Porter),* 90 B.R. 399 (N.D.Iowa 1988). The PCA is therefore entitled to the rents arising from the mortgaged property. Since CRP payments are considered rent payments, the PCA is entitled to the CRP payments at issue.

The Debtors also claim that the CRP Contract is a post-petition asset and that the security interest of PCA is cut off by the operation of 11 U.S.C. § 552. However, § 552(b) specifically provides that a secured creditors security interest in rents and profits continues in rents and profits acquired by the estate after the commencement of the case except to the extent the court, after notice and hearing, and based upon the equities of the case, orders other-

wise. The Debtors have made no argument that the equities of this case would dictate this Court modify the PCA's rights in the post-petition rents and profits. Accordingly, the argument that § 552 cuts off the PCA's post-petition security interest in CRP payments is without merit.

■■■■ Likewise, this Court finds that Debtors cannot prevail on their argument that the security interest of the PCA in the CRP payments is a preference. The PCA perfected its security interest in the rents long before the commencement of the ninety (90) day preference period. 11 U.S.C. § 547(b). Furthermore, it is unclear whether the Debtors are seriously asserting the preference issue. There was no evidence presented as to other elements of a preference, such as solvency or insolvency of the Debtors at the time of the alleged preferential transfer, or whether the transfer enabled the creditor to receive more than the creditor would have received had the alleged preference not occurred. 11 U.S.C. §§ 547(b)(3) & (b)(5)(B). Section 547(g) imposes upon the Trustee (or in this case, the Debtor-in-possession) the duty to prove all of the elements of a preference under § 547(b). Since the Debtors have failed to present proof and evidence on at least two of the elements required to prove a preference, their claim that the PCA security interest in the CRP payments is a preference must be denied.

## II. CLAIM OF CCC

The PCA contends that if the individuals and the partnership are distinct legal entities, as has herein been determined by this Court, then the CCC's UCC–1 and security agreement incorrectly identify the Debtor, and are therefore defective. Additionally, PCA claims that the collateral description on the UCC–1 does not reasonably allow for identification. Lastly, PCA alleges that on September 6, 1985, the Debtors' 1985 crops were still growing and the security agreements executed by the Debtors and CCC fail to list real estate descriptions which are required when growing crops are pledged as collateral.

CCC counters that since 1984, the Waters Brothers have transacted business with CCC as individuals and not as a partnership. Secondly, CCC claims that the collateral descriptions reasonably identify the property claimed as security for the CCC debt. Lastly, CCC claims that their financing statements do contain adequate real estate descriptions. Notwithstanding the inclusion of real estate descriptions, CCC contends that they are not required on the financing statements or the security agreements because any grain which is pledged as collateral to CCC must normally be harvested grain. CCC claims that financing statements were filed prior to the time the loans were made in order to expedite the loan process and real estate descriptions were included as a precautionary measure. The loans were not actually executed, nor were security agreements entered into until December of 1985, after all corn was harvested.

■■■ The requirements of security agreements have been discussed previously herein. The security agreements entered into by the Debtors and CCC which cover the 1985 crop all list the producer as Waters Brothers or George, Lyle, and Glen Waters. This is in fact contrary to CCC's claim of doing business solely with the individuals since 1984. It is clear that CCC knew it was dealing with the partnership after 1984 even though it was not aware of written partnership agreement. Notwithstanding this contradictory evidence, the security agreements at issue are valid and enforceable as between CCC and Waters Brothers Partnership. The question becomes one of perfection as to third parties.

■■■ The CCC filed separate financing statements for each of the individual Waters Brothers (and their respective wives) for crop years 1985, 1986, and 1987. The CCC filed no financing statement in the name of the Waters Brothers Partnership. It must then be decided whether three separate financing statements, each containing the name of one of the Waters brothers and his respective wife, is seriously misleading where the true partnership name is Waters Brothers.

This Court has previously discussed herein the statutory language and case law interpretation on the issue of seriously misleading names. It is not likely that a third party uncovering names of the individual Waters Brothers and their spouses would believe them to be Waters Brothers. The names as listed on CCC's financing statements are seriously misleading and this Court finds that CCC is not perfected in the Partnership's 1985 crops.

■ CCC makes an interesting argument alleging that each individual brother had sufficient rights in the collateral to allow the interests of CCC to attach to the grain. CCC claims that each partner would have the right to assign his interest, or grant a security interest in his portion of the crop so long as it was for legitimate partnership business. While this argument is persuasive, the Court could find no authority for this proposition. In fact, the case law indicates the opposite is true. *Lindley v. Murphy*, 387 Ill. 506, 56 N.E.2d 832 (1944) (A partner's interest in the partnership, within contemplation of Uniform Partnership Act, is his interest in the partnership as a business; upon dissolution of the partnership, a partner's interest includes his proper share of the remaining assets); *Gaines v. Gaines*, 519 S.W.2d 694 (Tex.Civ.App.1975) (A partner does not as between him and the partnership own title to specific property belonging to the partnership); *Mamolella v. Mamolella*, 73 Ill. App.3d 398, 29 Ill.Dec. 542, 392 N.E.2d 99 (1979) (A partner has no separate share in partnership property until the partnership is dissolved). In the case at bar, the Court finds that the individual partners of Waters Brothers own equal shares of the on-going business but do not separately own property belonging to the partnership.

■ The CCC makes a further argument that the partnership and PCA are estopped from contesting the validity of CCC's security interest. CCC asserts that the necessary elements to prove equitable estoppel in Iowa are: 1) a false representation was made or material facts were concealed; 2) the entity taking action lacked knowledge of the true facts; 3) the person

making the representation intended that it be relied upon; and 4) it was relied upon to the detriment and the prejudice of the party so acting. *Fernandez v. Iowa Department of Human Services*, 375 N.W.2d 701, 708, (Iowa 1985). This Court does not believe that a false representation was made by the Waters Brothers or that material facts were concealed. CCC knew as early as 1978 that the three brothers operated the farming business as Waters Brothers. It is not necessary that a partnership have a written partnership agreement in order to be considered a true partnership. The fact that the brothers failed to inform CCC that a written partnership agreement had been executed by the brothers is of no consequence. They were operating as a partnership prior to the execution of the agreement and they made no changes in the operation of the business after the execution of the agreement. The equitable estoppel argument is without merit.

■ CCC lastly claims that PCA has waived its lien in the 1985 crop concerned so if CCC's lien is not perfected the grain is unencumbered. It is this Courts understanding that the PCA waived its lien in the 1985 corn crop when the crop was sealed with the CCC and the sealing proceeds (CCC loan proceeds) were paid jointly to the Debtors and PCA. A CCC lien waiver extinguishes any lien the PCA may have in the corn which is the subject of the agreement between Debtors and CCC; this is true, even if the CCC fails to properly perfect its security interest. *Iowa Trust & Savings Bank v. United States Department of Agriculture*, 42 U.C.C.Rep.Serv. 1471 (N.D.Iowa 1986). The PCA does not seriously contest the fact that they are unsecured as to the 1985 crop which is under seal to the CCC. The 1985 grain presently stored on the Waters' farms is free and clear of any liens of PCA.

### ORDER

IT IS THEREFORE ORDERED as follows:

1. PCA has a perfected security interest in the livestock, machinery, and crops grown upon the real estate described in the January 19, 1984, security agreement.

2. PCA also has a perfected security interest in all government program payments, including deficiency payments which are attributable to the property described in the January 19, 1984, security agreement.

3. PCA has a perfected security interest in proceeds of the contract between Waters Brothers and North American Seeds, pursuant to the contract compensation assignment dated June 2, 1986.

4. PCA has a perfected lien against the Conservation Reserve Program payments received from real property which is subject to the PCA mortgages.

5. PCA does not have a perfected security interest in any of the crops grown upon land which is not described in the January 19, 1984, security agreement, nor, does PCA have a perfected security interest in any of the government program payments, including deficiency payments, which are attributable to the property which is not described in the security agreement.

6. Commodity Credit Corporation does not have a perfected security interest in the 1985 corn crop of Waters Brothers which is currently under seal with the CCC.

7. The PCA has no lien in the 1985 corn crop which is currently under seal with the CCC.

IT IS FURTHER ORDERED that the attorneys for PCA shall submit an order consistent with this opinion which more particularly sets forth the collateral which secures the PCA debt as well as specifying that property which is unencumbered. This Court shall set by separate notice a hearing on Debtors continued use of cash collateral.